[Cite as *Ma v. Cincinnati Children's Hosp.*, 2020-Ohio-1471.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| JUN MA, | : | APPEAL NO. C-180610 |
| | | TRIAL NO. A-1606910 |
| Plaintiff-Appellee, | : | |
| | | |
| vs. | : | *O P I N I O N.* |
| | : | |
| CINCINNATI CHILDREN'S HOSPITAL MEDICAL CENTER, | : | |
| | : | |
| Defendant-Appellant. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, Vacated in Part, and Cause Remanded

Date of Judgment Entry on Appeal: April 15, 2020

*Mezibov Butler* and *Marc D. Mezibov,* for Plaintiff-Appellee,

*Taft Stettinius & Hollister, LLP*, *W. Stuart Dornette, Beth A. Bryan* and *Evan T. Priestle,* for Defendant-Appellant.

**BERGERON, Judge.**

{¶1}   This case turns on the meaning of the term "tenure," a concept that the parties acknowledge is ambiguous on the record before us.  Everyone agrees that the plaintiff-appellee, Jun Ma, a PhD researcher working at defendant-appellant Cincinnati Children's Hospital Medical Center ("Children's") before his termination, received tenure, but no one can agree on exactly what that means.  To Children's, the term is essentially a formality that carries with it little more than prestige.  To Dr. Ma, it entitles him to just cause protection from termination, with all the trappings of due process.  The trial court granted Dr. Ma's summary judgment motion for declaratory relief, and it ordered Children's reinstate him, in addition to other remedies.

{¶2}   With the key contractual term ambiguous, that throws open the door to a consideration of extrinsic evidence.  Based on the record before the trial court, we agree that Dr. Ma established an entitlement to declaratory relief that tenure at Children's means just cause protection from termination, and we accordingly affirm that aspect of the trial court's decision.  But we go no further, and accordingly reverse the balance of the trial court's judgment, remanding the matter for further proceedings.

I.

{¶3}   To better understand the controversy in this case, we begin with an overview of the relationship between Children's and the University of Cincinnati ("University").  As outlined in the "Affiliation Agreement" between Children's and the University, because Children's serves as the Department of Pediatrics for the University's College of Medicine ("College of Medicine"), certain Children's employees—so-called "affiliated faculty"—receive

2

faculty appointments at the College of Medicine. But certain Children's rules and regulations govern these affiliated faculty appointments, rather than the University's. That distinction assumes significance because the American Association of University Professors ("AAUP") represents the University, and the AAUP defines "tenure" as "permanent or continuous tenure * * * terminated only for adequate cause." Pursuant to the "Affiliation Agreement," Children's maintains certain authority over affiliated faculty, not the University, and thus the AAUP definition does not control Dr. Ma's relationship to Children's. Children's can thus define tenure as it wishes consistent with basic contract law, but it had no operative written policy contemporaneous with Dr. Ma's receipt of tenure that elaborated on the concept. This leads us to the heart of this appeal: what does "tenure" at Children's mean, specifically as it applies to Dr. Ma.

{¶4} In June 1992, Dr. Ma received an offer letter from Children's for an affiliated faculty position in the Department of Pediatrics at the College of Medicine. Within this four-page offer letter, Children's delineated various aspects of Dr. Ma's employment, including salary, job responsibilities, funding requirements, and opportunities for promotion. Relevant to this appeal, the letter specified: "This is a tenure-track position on the faculty of the University of Cincinnati College of Medicine with a geographic base in the Children's Hospital Research Foundation. * * * You will be eligible for promotion and the granting of tenure no later than seven years after your initial appointment." Notably, nowhere within the four corners of the letter did Children's define the term tenure, nor did it incorporate or reference any other documentation that might shed light on that term.

{¶5} As for his responsibilities, the letter explained that, because Dr. Ma would devote about 90 percent of his time in this position to research, he must sustain his

3

individual research programs through external funding. Underscoring this point, Children's letter noted his performance reviews would evaluate his success in attracting external support for his programs. Nevertheless, if Dr. Ma did fall short in maintaining adequate external support, Children's would provide "bridge funding" for a year or two to help when gaps occurred. Beyond that, the offer letter failed to elucidate any consequences for falling short of external funding.

{¶6} After mulling it over, Dr. Ma accepted Children's offer, beginning work several months later in September 1992. Five years later, Dr. Ma embarked on the tenure review process in an effort to secure tenure, emphasizing in his application his academic scholarship, teaching contributions, and well-funded research projects. Following several levels of administrative review within both Children's and the University, the Reappointment, Promotion, and Tenure Committee (the "RPT committee") for the Department of Pediatrics unanimously voted to recommend Dr. Ma's promotion "with tenure to Associate Professor-AFF in the Department of Pediatrics." In turn, the University's Board of Trustees approved his tenure recommendation. And finally, in June 1998, after navigating this extensive process, Dr. Ma received a letter from the Dean of the College of Medicine relaying the good news informing Dr. Ma that his tenure would go into effect in September 1999. Missing from this correspondence, however, is any definition of tenure or any explanation of what that benefit entails. In fact, at this point in time, the record before us establishes that Children's did not possess any written tenure policy for affiliated faculty.

{¶7} Years later, in 2007, Dr. Ma received an offer for a tenured position with the University of Houston. As a result of this offer, Dr. Ma approached Children's in an effort to

4

leverage a better deal for himself, and the parties engaged in dialog on that topic. Both parties ultimately agreed that, in exchange for Dr. Ma remaining at Children's, he would receive a new primary faculty appointment within the Children's Division of Biomedical Informatics, and Children's would recommend him for a promotion to Full Professor. Dr. Ma also received a salary increase with the caveat that Children's could not guarantee funds to maintain the operation of his laboratory if a funding gap should occur. Imprecision on the funding aspect would cause problems down the road, but regardless, the parties agree that nowhere in these 2007 negotiations did Children's alter Dr. Ma's tenured employment status or amend the nature of tenure.

{¶8} The honeymoon after the renegotiation did not, however, last long. During his 2009 performance review, Dr. Ma received a "Needs Improvement" rating based upon his failure to sustain external funding and low record of publications. After this warning, Children's failed to see the requisite improvement, and in 2013, he again received a poor review of "Expectations Not Met" for similar reasons in hand with a notification that obtaining external funding and renewing his current grant should be a top priority in 2015. Unfortunately, Dr. Ma continued to fall short of Children's expectations, receiving another "Expectations Not Met" in his 2015 performance review for his insufficient funding level. However, this time his performance review included a warning that if Dr. Ma did not "show much more success in garnering research support for his salary and laboratory, [] he will need to explore alternatives." Ultimately, in June 2016, Children's informed Dr. Ma that it could no longer support his position based on the lack of outside funding, and it accordingly offered him various options that would culminate in his voluntary resignation. Dr. Ma rebuked this offer, leading Children's to terminate him in March 2017.

{¶9} Prior to his termination, in December 2016, Dr. Ma filed a complaint against Children's and the College of Medicine, asserting claims for a declaratory judgment, promissory estoppel, and fraudulent inducement, and seeking declaratory and injunctive relief. Specifically, Dr. Ma sought a declaration from the court that his tenure at Children's prohibits it from terminating Dr. Ma without just cause and an opportunity to challenge the grounds for termination. Roughly two months after filing his complaint, Dr. Ma moved for a preliminary injunction preventing his termination, which the trial court denied, paving the way for his termination. The day before the trial court denied his motion for a preliminary injunction, Dr. Ma also moved for partial summary judgment on his promissory estoppel and declaratory judgment claims. In the midst of these procedural wranglings, the College of Medicine moved for its own dismissal from the case, which the court granted, leaving Children's the sole defendant in the suit.

{¶10} In support of Dr. Ma's summary judgment motion, he argued that when Children's awarded him tenure in 1998 (to go into effect in September 1999), it altered his at-will employment status, shielding him from termination absent just cause. To support his interpretation of the term "tenure," Dr. Ma presented testimony from himself, Dr. David Rubin, the Executive Director at the University of Cincinnati Chapter of the AAUP between 1996 and 2004, and Dr. Sandra Degen, the Professor of Pediatrics and Associate Chair of Academic Affairs at Children's between 1997 and 2015. Dr. Degen's testimony perhaps formed the centerpiece of Dr. Ma's motion, as she chaired the RPT committee that recommended Dr. Ma receive tenure. She substantiated his interpretation of tenure, but only to the extent that at the time Children's awarded him tenure, it afforded him continued

6

employment absent just cause for termination. In other words, she did not suggest that tenure encompassed the full panoply of due process protections.

{¶11} In response, Children's offered three witnesses, all of whom confirmed its understanding of tenure—a title chalked full of prestige but little else. The main benefit tenure carries beyond prestige, according to these witnesses, was to excuse tenured faculty from the drudgery of reapplying for their jobs on a regular basis. To vouch for this interpretation, Children's relied primarily on Dr. Margaret Hostetter, its Civ.R. 30(B)(5) corporate designee and current Chief Medical Officer. During her deposition, Dr. Hostetter repeatedly affirmed Children's understanding of tenure, but when asked for documents substantiating this point, she was at a loss, unable to identify any such documents. Dr. Hostetter also acknowledged her lack of personal knowledge concerning the tenure policies when Dr. Ma received it (she joined Children's in 2010) during her deposition, instead recognizing Dr. Degen as someone who would be familiar with the terms and conditions of tenure as awarded by Children's in the late 90's.

{¶12} Upon considering both parties' evidence, the trial court sided with Dr. Ma, granting his motion for partial summary judgment on his declaratory judgment claim. Specifically, the court declared that tenure at Children's (1) entitles Dr. Ma to continued employment, absent just cause for termination, and (2) provides Dr. Ma with due process protections, including a meaningful opportunity to be heard. In terms of relief, the court ordered, under the purview of the Ohio Declaratory Judgment Act, Children's to immediately reinstate Dr. Ma to his prior full-time faculty position, reestablish his research laboratory, and restore him all back-pay and employment benefits he would have received

had Children's not terminated him. Notably, the trial court never squarely resolved Dr. Ma's promissory estoppel claim.

{¶13} Children's now appeals, raising three assignments of error, each challenging different aspects of the court's order granting partial summary judgment. Specifically, Children's assigns error to the court adopting Dr. Ma's interpretation of tenure, ordering Children's to reinstate Dr. Ma, and entering declaratory judgment against Children's when the College of Medicine, in Children's view, constituted a necessary party absent from the litigation. Because the outcome of this appeal (in large measure) turns on the meaning of "tenure" as it applies to Dr. Ma, we begin our analysis with the court's declaration regarding tenure and the rights it affords.

II.

A.

{¶14} In its first assignment of error, Children's challenges the trial court's order granting Dr. Ma's motion for partial summary judgment, raising various issues with the court's interpretation of the word "tenure." In Children's view, the court erred not only because Dr. Ma failed to present sufficient evidence that tenure included just cause protection from termination and procedural due process rights, but also because Children's offered conflicting evidence that generated a material dispute of fact. We review the trial court's order granting Dr. Ma's motion for summary judgment de novo, construing the evidence in the light most favorable to Children's. *See Wal-Mart Realty Co. v. Tri-Cty. Commons Assocs., LLC*, 1st Dist. Hamilton No. C-160747, 2017-Ohio-9280, ¶ 8. In doing so, we must independently appraise the evidence before the trial court without deference to the trial court's decision. *See Career & Technical Assn. v. Auburn Vocational School Dist.*

8

*Bd. of Edn.*, 11th Dist. Lake No. 2013-L-010, 2014-Ohio-1572, ¶ 17 ("A de novo review requires the appellate court to conduct an independent review without deference to the trial court's decision.").

{¶15} It is well-established that summary judgment is appropriate only when (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that one conclusion is adverse to the nonmoving party. *See City of Cincinnati v. Triton Servs., Inc.*, 2019-Ohio-3108, ___ N.E.3d ___, ¶ 52 (1st Dist.). Once a party moves for summary judgment, as Dr. Ma did here, and supports it with evidence outlined in Civ.R. 56(C) (i.e., pleadings, depositions, affidavits, answers to interrogatories), the nonmoving party must reciprocate with its own contradictory evidence in order to create a genuine issue of fact for trial. *See Columbia Dev. Corp. v. Krohn*, 1st Dist. Hamilton No. C-1300842, 2014-Ohio-5607, ¶ 17, citing *Wing v. Anchor Media, Ltd. of Texas*, 59 Ohio St.3d 108, 111, 570 N.E.2d 1095 (1991) ("Once a motion for summary judgment has been made and supported as provided in Civ.R. 56(C), the nonmoving party has a reciprocal burden to set forth specific evidentiary facts showing the existence of a genuine issue for trial, and cannot rest on the allegations or denials in the pleadings."). Needless to say, if the moving party fails to meet its burden at the outset, then no duty shifts to the responding party to produce its own evidence, and the court must deny the motion. *Id.*

B.

{¶16} As noted above, the trial court here granted partial summary judgment with respect to Dr. Ma's declaratory judgment claim. In his motion for summary judgment, Dr. Ma sought relief pursuant to R.C. Chapter 2721, requesting that the court provide a

declaration that Children's altered his status as an at-will employee when it granted him tenure back in 1998, and that this tenure status entitled him to both continued employment without termination absent just cause and a meaningful opportunity to be heard prior to termination. R.C. Chapter 2721 provides that either before or after a breach occurs, "any person interested under a written contract, or other writing constituting a contract, may bring a declaratory-judgment action to have a court determine any question of construction or rights arising under the contract[.]" *Waldman v. Pitcher*, 2016-Ohio-5909, 70 N.E.3d 1025, ¶ 19 (1st Dist.), citing R.C. 2721.03 and 2721.04. Often when a party seeks clarification concerning his or her rights under a contract, the court must first determine whether the contract's terms are "ambiguous." *See Cincinnati Ins. Co. v. ACE INA Holdings, Inc.*, 175 Ohio App.3d 266, 2007-Ohio-5576, 886 N.E.2d 876, ¶ 8, 24 (1st Dist.) (determining first in declaratory judgment action that the term "aggregate" was indeed ambiguous and thus the court properly considered extrinsic evidence to determine rights under the agreement).

{¶17} The root of the dispute in this case traces to the fact that we are not dealing with an integrated, single-document contract that neatly captures all the rights and duties of the parties. Instead, we face a series of communications over a number of years that give rise to the contractual relationship, but the operative term "tenure" is never explained. As in any contractual dispute, our "primary objective is to ascertain and give effect to the parties' intent," all the while looking towards the language the parties chose to employ. *Wal-Mart Realty,* 1st Dist. Hamilton No. C-160747, 2017-Ohio-9280, at ¶ 10. For that reason, if the provision is clear and unambiguous, we need not stray beyond the plain language of the agreement. *See Shifrin v. Forest City Ents., Inc.*, 64 Ohio St.3d 635, 638,

597 N.E.2d 499 (1992). But if the provision admits of ambiguity, then the court may resort to extrinsic evidence to discern the parties' intent.[1] *See Kahler v. Cincinnati Inc.,* 1st Dist. Hamilton No. C-140407, 2015-Ohio-979, ¶ 17. Generally, when contract language is "susceptible to two or more reasonable interpretations," then ambiguity exists—and this situation can occur when "a material phrase in the provision is undefined." *Career & Technical Assn.,* 11th Dist. Lake No. 2013-L-010, 2014-Ohio-1572, at ¶ 18; *see Bates v. Cincinnati,* 2013-Ohio-5893, 7 N.E.3d 521, ¶ 13 (1st Dist.), quoting *Wittstein v. Wittstein,* 12th Dist. Madison No. CA2006-03-013, 2006-Ohio-6707, ¶ 8 ("Contract terms are ambiguous where the language is susceptible to two or more reasonable interpretations.").

{¶18} Based on the two conflicting, but reasonable, interpretations Dr. Ma and Children's advance regarding the term "tenure," we have no trouble finding ambiguity here (and the parties essentially concede this point), particularly in the absence of any definition of this key term anywhere in the parties' various written communications. *See Euclid Asphalt Paving Co., Inc. v. Mt. Zion Fellowship Church,* 11th Dist. Lake No. 2004-L-175, 2005-Ohio-7049, ¶ 17 ("Here, the contract in question is reasonably susceptible to more than one interpretation, i.e. one could reasonably find the agreement ambiguous by virtue of the undefined character of the phrase 'additional area.' "). Although ordinarily courts should not grant summary judgment when an ambiguity exists, *see Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 13 ("It is generally the role of the finder of fact to resolve ambiguity."), if the extrinsic evidence stands undisputed, then the court may take this step. (Citation omitted.) *See Lewis v. Mathes,* 161 Ohio App.3d 1, 2005-Ohio-1975, 829 N.E.2d 318, ¶ 25 (4th Dist.) ("Ordinarily, summary judgment is

---

[1] Given the nature of the agreement at hand, other tools of contractual interpretation offer us no aid here.

inappropriate when contractual language is ambiguous, because a question of fact remains. But if the extrinsic evidence demonstrates that no genuine issue of material fact exists, we conclude that summary judgment may still be appropriate."); *Cincinnati Ins. Co.* at ¶ 60 (affirming the trial court's decision to grant summary judgment in part because the extrinsic evidence resolved the ambiguity). Such extrinsic evidence may include circumstances surrounding the parties' negotiations or actions at the time they entered into the contract, the objectives they intended to accomplish, and any actions by the parties demonstrating how they interpreted the ambiguous term. *See Covington v. Lucia*, 151 Ohio App.3d 409, 2003-Ohio-346, 784 N.E.2d 186, ¶ 18 (10th Dist.). Normally, a party would need to convey its gloss on an ambiguous term to the counterparty for that to be probative, but sometimes "extrinsic evidence may include a contracting party's own statement about what he understood the disputed contract term to mean when he wrote, negotiated, or signed the contract." *Urban Assocs., Inc. v. Standex Electronics, Inc.*, 6th Cir. No. 06-1279, 2007 WL 328789, *9 (Feb. 1, 2007) (applying Ohio law to a contract dispute between two companies); *see Prokos v. Jones,* 4th Dist. Athens No. 18CA8, 2019-Ohio-519 (affirming trial result after the trial court correctly denied summary judgment when parties both had conflicting subjective interpretations of ambiguous contractual language). That particularly rings true when both sides share a common understanding of a term, even if they neglected to discuss the point.

{¶19} We accordingly turn our attention to the extrinsic evidence marshalled by both sides in support of their interpretations of the term "tenure." Turning first to Dr. Ma's extrinsic evidence, during his deposition, Dr. Ma insisted that he understood at the time that he received tenure that the concept meant just cause protection from termination.

12

While he cannot point to any document ratifying his point, he recollects his own conversations with colleagues and mentors at that time, noting that this definition of tenure was "just a generally accepted notion." Indeed, this vision of tenure aligns with a common understanding of the term in the academic community.[2] Bolstering his subjective understanding, Dr. Degen also viewed tenure at Children's this way—"it was generally understood within that institution * * * that an award of tenure confers continued employment * * * [in] the absence of any just cause for termination of employment[.]" Further, Dr. Degen also confirmed that, at the time Dr. Ma received tenure, "there were no specific rules or policies defining the terms and conditions for tenure at [Children's][.]"

{¶20} Notably, Dr. Degen not only worked for Children's at the time it awarded Dr. Ma tenure, but she also chaired the very committee that recommended he receive it. Accordingly, the significance of Dr. Degen's testimony cannot be overstated, as she is someone with personal knowledge of the tenure terms and conditions, her committee evaluated Dr. Ma's suitability for tenure, and she substantiates Dr. Ma's interpretation.[3] *See Urban Associates* at *11 (adopting plaintiff's interpretation of the term "orders booked" based on extrinsic evidence from "the very [company] official who drafted the agreement" because he corroborated plaintiff's understanding of the ambiguous term); *Becker v. Direct Energy, LP*, 2018-Ohio-4134, 112 N.E.3d 978, ¶ 51, 54 (2d Dist.) (relying on extrinsic evidence in the form of CEO's testimony on the definition of "willful misconduct," because

---

[2] We hasten to add that we do not mean to offer an interpretation of tenure beyond the limited facts in the record here. To be sure, Children's points to evidence of contrary concepts of tenure from other institutions, and ultimately we assign no weight to how other institutions may have implemented this principle beyond the walls of Children's. We mention this point here only to show that Dr. Ma's interpretation was not simply cut from whole cloth.

[3] The dissent accuses us of improperly inflating the significance of Dr. Degen's testimony, but the dissent's conclusion that there was "competing" extrinsic evidence acknowledges that Dr. Ma carried his burden to produce evidence of his interpretation of tenure.

he was present when the company hired plaintiff and signed the employment agreement on the company's behalf). We presume that the head of the committee recommending tenure understood what tenure meant.

{¶21} Therefore, in light of the extrinsic evidence that Dr. Ma put forth—his understanding of the term, Dr. Degen's understanding, and the absence of any documents to the contrary—Dr. Ma provided sufficient evidence to meet his initial burden that tenure under the parties' employment contract, at the very least, entitled him to continued employment absent just cause for termination. With that established, the burden then shifted to Children's to create a genuine issue of material fact necessitating a trial. *See Perkins v. 122 E. 6th Street, LLC*, 2017-Ohio-5592, 94 N.E.3d 207, ¶ 13 (1st Dist.) ("Consequently, the burden shifted to [plaintiff] to set forth specific facts showing a genuine issue of material fact.").

{¶22} But here, Children's fell short. While Children's did put forth three witnesses who shared its view of the meaning of "tenure," none of these individuals were employed by Children's at the time Dr. Ma received tenure and none of them purported to testify as to Children's contractual intent at that time. Children's leans most heavily upon Dr. Hostetter, its Civ.R. 30(B)(5) corporate designee and Chief Medical Officer, emphasizing that her testimony established a genuine issue of material fact as to the meaning of tenure. While Dr. Hostetter repeatedly testified that all professors, tenured or not, maintain at-will employment status and that tenured professors simply do not have to undergo periodic renewal applications, her testimony suffered from two flaws that prevent it from generating a material dispute of fact.

**{¶23}** First, as a corporate representative who was not at Children's during the operative 1997-99 timeframe (she joined Children's in 2010), Dr. Hostetter necessarily had to rely on the knowledge of others to support her testimony. In this regard, she testified that she gained her understanding of what tenure meant (according to Children's) from a review of documents—and not by a discussion with anyone associated with the hospital. However, cross-examination during the deposition laid bare the problem with this approach—Dr. Hostetter acknowledged (several times) that she is unaware of any document substantiating her conclusion on the meaning of tenure. In fact, when probed during her deposition concerning a document that sets forth Dr. Hostetter's understanding of tenure, she conceded, "[t]o my knowledge, there is no written policy to that effect[.]" And she continued to reiterate this point, maintaining throughout the balance of her deposition that "[t]here's no written policy regarding tenure at Cincinnati Children's." The only documents she identifies, the "Affiliation Agreement" (specifying Children's is not governed by the AAUP bargaining unit) and Children's Human Resources Policy (describing all Children's employees, with or without tenure, are at-will) both postdate the period that Dr. Ma received tenure and, regardless, neither purports to define tenure at all. A corporate representative who lacks personal knowledge and relies solely on documents cannot conjure up testimony that goes well beyond those documents.

**{¶24}** Second, Dr. Hostetter never specified in her deposition that Children's intent in 1997-99 was to accord Dr. Ma the watered-down version of tenure. Underscoring this point, after acknowledging that she was not present at the time Dr. Ma received tenure, she recognized Dr. Degen as someone who would be familiar with the terms and conditions of tenure as granted by Children's in 1997. Thus, she specifically identified (and seemingly

15

deferred to) Dr. Ma's primary witness as an authority on contractual intent (contrary to the dissent's portrayal of Dr. Degen as a know-nothing pawn): "I think at that time Dr. Degen understood what promotion to associate professor of pediatrics with tenure * * * meant."

{¶25} Children's other two witnesses suffered from similar limitations. Dr. Arnold Strauss, the Professor of Pediatrics and the Associate Director of Children's Research Foundation since 2007, explained that "neither the rank of professor nor award of tenure guarantees employment, at least here in Cincinnati Children's." Following suit, Dr. Peter White, a Children's Professor and Division Director of Biomedical Informatics since 2014, testified about his personal experience with tenure at Children's, maintaining tenure at Children's offers "some prestige," but "no security." Neither witness, however, claimed any knowledge regarding the relevant negotiations nor any knowledge of Children's tenure policies at the time Dr. Ma received tenure. During Dr. White's deposition, he conceded he cannot recall a time he even observed a Children's offer letter prior to 2014, acknowledging he possessed "no knowledge of" earlier correspondence or communications. Similarly, during his deposition, Dr. Strauss admitted he did not know "the practice or procedure or policy prior to 2007."

{¶26} The dissent says very little about Children's testimony because there is little to say. Instead, the dissent focuses on the so-called "sustained-funding requirement" and the Affiliation Agreement as the bedrocks for creating a factual dispute. No one contends that this "requirement" or this agreement purport to define tenure with respect to Dr. Ma. Yes, we must construe evidence in Children's favor, but this does not extend to bending over backwards to credit evidence that does not speak to the key term at hand. Underscoring the point, one can search Children's brief in vain for any argument like the dissent fashions

16

about some "sustained-funding requirement" that operates as a type of nebulous policy that "impli[es]" certain obligations. Even further afield sits the Affiliation Agreement, which by its terms does not apply to Dr. Ma. Seizing upon an agreement that does not apply to generate a factual dispute about the agreement at hand strains credulity. The dissent leaves the impression that the Affiliation Agreement might govern Dr. Ma's relationship with Children's, but that defies the record and likewise stretches beyond Children's arguments in this appeal. In any event, while the dissent frames the "sustained-funding requirement" as irreconcilable with a just cause concept of tenure, we do not see it that way. A contractual provision about funding could supply obligations that, if breached, may present cause for termination. We express no view on that matter, but simply note it for purposes of explaining how the dissent overplays this hand. Similarly, the dissent's point about background employment law does not punch Children's ticket to trial because those default rules can be altered by the parties; and here, the record established that they did just that.

{¶27} On the state of the record before us, therefore, Children's failed to demonstrate a material issue of fact for trial on whether tenure encompasses just cause protection from termination at the time Dr. Ma received it. *See Werden v. The Children's Hosp. Med. Ctr.*, 1st Dist. Hamilton No. C-040889, 2006-Ohio-4600, ¶ 39 ("Because the [plaintiffs] failed to come forward with competent evidence demonstrating a genuine issue of fact for trial * * * the trial court properly granted summary judgment[.]"); *Evans v. Wallen*, 2d Dist. Montgomery No. 20171, 2006-Ohio-3193, ¶ 14 ("[T]he extrinsic evidence failed to create a genuine issue of material fact that [plaintiff] had knowledge of the elements of a valid offer of UM/UIM coverage."); *Lewis*, 161 Ohio App.3d 1, 2005-Ohio-1975, 829 N.E.2d 318, at ¶ 33 ("Based upon the foregoing, construing the evidence most

17

strongly in [appellant's] favor, we find that no genuine issue of material fact exists and that the [appellees] are entitled to judgment as a matter of law."). Nor did Children's adduce evidence that the meaning of tenure changed after 1999 (akin to a contractual amendment or modification argument). Accordingly, because the extrinsic evidence here resolved the ambiguity, insofar as the just cause protection, the trial court correctly granted partial summary judgment on that portion of the declaratory judgment claim.

C.

{¶28} But Dr. Ma invites a more expansive definition of tenure beyond just cause protection, envisioning that Children's agreed to provide basic procedural due process protections such as notice and the right to a hearing. With respect to this gloss on tenure, however, we reach a different result because Dr. Ma failed to meet his initial burden of demonstrating no genuine issue of material fact existed. Dr. Ma anchors his belief that he should receive due process to a vague statement in his affidavit that "an opportunity to challenge any allegation(s) against me" is an integral aspect to tenure. We see several problems with this. First, when asked in his deposition what he understands tenure to mean, any discussion of procedural due process is noticeably absent from Dr. Ma's answers. Second, the conclusory statement in the affidavit is too slender a reed to trigger due process protections given its vague and nebulous manner. *See Stepp v. Medina City School Dist. Bd. of Edn.*, 2016-Ohio-5875, 71 N.E.3d 609, ¶ 28 (9th Dist.) (affirming the trial court's denial of summary judgment in an immunity case because "the Board Members' conclusory assertion that their request for the state auditor to investigate [the plaintiff's] past expenses was not evidence of malice [was] insufficient for a moving party to discharge its initial burden on summary judgment."); *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264

18

(1996) ("The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion[.]").  And finally, unlike the just cause aspect, no evidence in the record substantiates any procedural due process protection.  *See Dresher* at 293 (Emphasis sic.) ("[T]he moving party must be able to specifically point to some *evidence* of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims.").  At no point during Dr. Degen's testimony does she validate Dr. Ma's understanding that tenure in 1997-99 also included procedural due process safeguards.  Nor does any other witness or document vouch for the point.

**{¶29}**  Therefore, because Dr. Ma never met his initial burden of establishing that tenure at Children's also encompassed procedural due process guarantees, partial summary judgment in his favor was improper in this regard.  *See Concrete Coring Co. v. Gantzer*, 1st Dist. Hamilton No. C-020119, 2002-Ohio-6655, ¶ 19 ("Accordingly, summary judgment was not appropriate because [defendant] had failed in meeting his initial burden of demonstrating that there was no genuine material fact regarding who had employed him between 1991 and 2001.").  Accordingly, we affirm that the court's summary judgment order granting declaratory judgment *only* to the extent that the trial court found tenure means continued employment absent just cause for termination.  And we reverse the holding that tenure at Children's (as far as this record goes) encompasses certain procedural due process protections.

### D.

**{¶30}**  Based on the trial court's order, it is unclear whether it intended to grant relief under the doctrine of promissory estoppel (which Dr. Ma sought) or whether it limited

the relief to a declaratory judgment. In its opinion granting summary judgment, the court included a heading for promissory estoppel, but never explicitly analyzed Dr. Ma's promissory estoppel claim (or, for instance, any of the elements of promissory estoppel). We briefly address this point to clarify that the trial court should not have ordered relief for promissory estoppel to the extent it endeavored to do so.

{¶31} It is well-established that the doctrine of promissory estoppel only arises when the requisites of a contract are not met and a promise needs to be enforced to avoid injustice. *See Maddali v. Haverkamp*, 1st Dist. Hamilton No. C-180360, 2019-Ohio-1518, ¶ 14, quoting *Olympic Holding Co., L.L.C. v. ACE Ltd.*, 122 Ohio St.3d 89, 2009-Ohio-2057, 909 N.E.2d 93, ¶ 39 (" 'The doctrine of promissory estoppel comes into play where the requisites of contract are not met, yet the promise should be enforced to avoid injustice.' "). Stated differently, promissory estoppel is unavailable as a remedy where a valid and enforceable contract governs the relationship. *See Kahler,* 1st Dist. Hamilton No. C-140407, 2015-Ohio-979, at ¶ 20, quoting *Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 181 (6th Cir.1996) ("Where parties enter into an enforceable written contract 'and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel.' ").

{¶32} As evident from our analysis above, Dr. Ma and Children's both effectively acknowledge their contractual relationship and fence over the details of what that contract means. Therefore, because a valid and binding contract governs Dr. Ma's employment, we see no role for promissory estoppel to play here, unless he offered evidence that additional or supplemental promises existed beyond the original contractual agreement (for instance to establish the procedural due process protections). *See Padula v. Wagner*, 2015-Ohio-

2374, 37 N.E.3d 799, ¶ 43 (9th Dist.) ("Accordingly, no cause of action based in promissory estoppel will lie regarding [plaintiff's] term of employment or claim that he was entitled to additional compensation, where valid, binding contracts govern these matters, and no additional or supplemental promises have been alleged."). But this option cannot salvage a promissory estoppel claim on the record before us. Nowhere in the record do we see any allegations that Children's made additional promises regarding due process protections outside of its valid employment contract. Therefore, to the extent that the trial court granted summary judgment on this point, we reverse that portion of the trial court's order.

III.

{¶33} These rulings we have reached above require us to vacate the remedies awarded by the trial court. After granting declaratory judgment in Dr. Ma's favor, the trial court directed Children's to (1) reinstate Dr. Ma to his full-time faculty position, (2) reestablish his research laboratory, and (3) restore to him all back-pay and employment benefits for the time between termination and reinstatement. In its first and second assignments of error, Children's challenges the remedies awarded by the trial court. However, in light of our disposition above, the remedial question is premature at this point.

{¶34} Because Dr. Ma only established a right to declaratory relief that tenure means just cause protection from termination, at this point, he is entitled to no relief beyond that declaration. For instance, if he desired to recover back-pay and reinstatement (as awarded by the trial court), he would have to prevail in proving that Children's lacked just cause to terminate him. That question has certainly not been resolved on the record

21

before us.[4]  The same point holds true for reconstituting Dr. Ma's laboratory.  Consequently, we vacate all remedies awarded by the trial court besides the limited declaratory relief that we discussed above, and to that limited extent, sustain the remedial challenges in Children's first and second assignments of error.

IV.

{¶35}  Turning to its third, and last, assignment of error, Children's asserts that the trial court violated R.C. 2721.12(A) when it entered a declaratory judgment that affected a necessary party—the College of Medicine.  Children's frames this as a jurisdictional defect that precludes the court from rendering a declaratory judgment, citing *City of Cincinnati v. Whitman*, 44 Ohio St.2d 58, 337 N.E.2d 773 (1975), for support.  *See id.* at 59, quoting *City of Zanesville v. Zanesville Canal & Mfg. Co.*, 159 Ohio St. 203, 111 N.E.2d 922 (1953), paragraph three of the syllabus ("One of the requisites to the rendition of a declaratory judgment is that all necessary parties be before the court, and the absence of an interested and necessary party 'constitutes a jurisdictional defect which precludes the court from properly rendering a declaratory judgment.' ").  Based on our disposition above, we only address this assignment of error insofar as it relates to the court's declaration that tenure includes just cause protections.

{¶36}  Pursuant to R.C. 2721.12(A), when a party seeks declaratory relief under this chapter, "all persons who have or claim any interest that would be affected by the declaration shall be made parties to the action or proceeding."  Determining "whether a nonparty is a necessary party to a declaratory-judgment action depends upon whether that nonparty has a legally protectable interest in rights that are the subject matter of the

_____

[4] We understand that Children's presents various defenses to the relief awarded here, and we similarly decline to reach them at this juncture.  The trial court will have to assess such matters upon remand.

action." *Rumpke Sanitary Landfill, Inc. v. State*, 128 Ohio St.3d 41, 2010-Ohio-6037, 941 N.E.2d 1161, ¶ 15. And, as reiterated by Ohio courts time and time again, "a person's practical interest in the outcome of a legal dispute does not necessarily require his or her inclusion in a declaratory judgment action." *Karras v. Karras*, 2017-Ohio-5829, 94 N.E.3d 1036, ¶ 26 (2d Dist.); *see Potts v. Unglaciated Industries, Inc.,* 2016-Ohio-8559, 77 N.E.3d 415, ¶ 50 (7th Dist.) ("A nonparty's mere practical interest in the subject matter does not rise to the level of a legal interest.").

{¶37} In this case, Children's offers no concrete reason why the declaratory judgment here would affect the College of Medicine, never articulating what "legally protectable interest" the College of Medicine maintains in this fight. We also point out that both the College of Medicine and Children's seemed to confirm the contrary point in their briefing below, with the College of Medicine insisting that "there is no justiciable controversy between Ma and [the College of Medicine]," and Children's echoing that it "does not believe that [the College of Medicine] is a necessary party to the underlying employment matter (because Plaintiff is solely a [Children's] employee)[.]" We think those concessions below adequately capture the College of Medicine's lack of a sufficient interest in this dispute. Therefore, because Children's fails to establish how the declaratory judgment here, to the extent we affirm it above, would affect the College of Medicine, we cannot hold the College of Medicine was a necessary party precluding the court from rendering declaratory judgment. Accordingly, we overrule Children's third assignment of error.

V.

{¶38} For all the foregoing reasons, we ultimately affirm in part, reverse in part, and vacate in part the judgment granting Dr. Ma partial summary judgment, and we remand the

23

cause to the trial court. Specifically, we affirm only the portion of the trial court's judgment that declared tenure entitled Dr. Ma to continued employment at Children's, absent just cause for his termination, and we accordingly overrule Children's first assignment of error in this respect. However, we reverse the court's declaration that tenure also entitled Dr. Ma to procedural due process protections (and reverse any finding of promissory estoppel), and therefore, we sustain Children's first assignment of error in part. Further, in light of our disposition on the merits, we vacate the remedies awarded by the trial court (except for declaratory relief finding that tenure entails just cause protection) and accordingly sustain Children's first (in part) and second assignments of error at this juncture because the remedial question is premature and must be addressed upon remand. *See* App.R. 12(A). In addition, we overrule Children's third assignment of error.

Judgment accordingly.

**CROUSE, J.,** concurs.
**ZAYAS, P.J.,** concurs in part and dissents in part.

**ZAYAS, P.J.,** concurring in part and dissenting in part.

{¶39} The parties to this case put forth disputed extrinsic evidence regarding the meaning of an ambiguous term to an employment contract, prohibiting a resolution on summary judgment. Therefore, I dissent from the portion of the majority opinion affirming the trial court's judgment.

{¶40} It is a well-established rule in Ohio that if "the provisions of a contract are ambiguous and the meaning of a material term is not apparent from the four corners of the contract, an issue of fact exists, making summary judgment inappropriate." *M.G.A., Inc. v. Amelia Station, Ltd.*, 1st Dist. Hamilton No. C-010606, 2002-Ohio-5091, ¶ 9, citing *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.*, 15 Ohio St.3d 321, 322, 474

24

N.E.2d 271 (1984). An exception to this rule occurs where undisputed extrinsic evidence resolves the ambiguity in a material term—which generally means that no genuine issue of material fact exists, making summary judgment appropriate. *See Cincinnati Ins. Co. v. ACE INA Holdings, Inc.*, 175 Ohio App.3d 266, 2007-Ohio-5576, 886 N.E.2d 876 (1st Dist.) (finding that the trial court properly considered undisputed extrinsic evidence to determine the meaning of an ambiguous contractual term). But that exception does not apply here. Dr. Ma and Children's submitted disputed evidence on whether Dr. Ma was an at-will employee at the time he was terminated. The majority overlooks this dispute in extrinsic evidence and proceeds to construe the evidence in Dr. Ma's favor, ultimately substituting one erroneous decision for another.

**Disputed Extrinsic Evidence**

{¶41} In an effort to convince the trial court to resolve the ambiguous term "tenure" in their favor, the parties submitted several pieces of extrinsic evidence. Notably, Dr. Ma presented the testimony of Dr. Sandra Degen, along with her affidavit, several letters from Children's, and a few of his annual faculty evaluations. Children's put forth Dr. Hostetter's deposition testimony and her affidavit, as well as the Affiliation Agreement with University of Cincinnati, and Children's Faculty Guidelines on the Criteria for Appointment, Reappointment, Promotion and Tenure. As explained below, the majority's interpretation of this evidence in particular is problematic.

{¶42} The majority asserts that the significance of Dr. Degen's testimony cannot be overstated, but her testimony *was* overstated in three major ways. First, Dr. Degen was initially employed at Children's at most ten months prior to writing her letter to Dr. Boat

confirming the RPT Committee's recommendation of tenure to Dr. Ma.[5] In other words, at that time she was little more than the messenger delivering word of Dr. Ma's recommendation for tenure. She did not have an intimate knowledge of the "terms and conditions" of tenure at Children's, or know how they applied to a contractual relationship with a particular professor that she had not known. Her testimony was that *the Committee* made the recommendation to award Dr. Ma tenure, and the Board of Trustees ultimately affirmed that recommendation.[6] Dr. Degen did not create the tenure policy at Children's, nor did she extend the offer of tenure to Dr. Ma on Children's behalf—the latter appears to have been done by Dr. John Hutton, the dean of the College of Medicine, many steps after the RPT Committee's initial recommendation. Moreover, Dr. Hostetter did not defer to Dr. Degen as authority on Children's contractual intent, "seemingly" or otherwise. Dr. Hostetter testified that she could not speak to Dr. Degen's understanding of tenure at the time Dr. Degen worked for Children's on the RPT Committee, but that the letter Dr. Degen wrote confirming the RPT Committee's recommendation referred to tenure as it was at

---

[5] She began her employment with Children's in 1997, the same year that Dr. Ma was up for promotion to a tenured-status associate professor. She wrote the letter to Dr. Boat, confirming the recommendation of tenure by the RPT Committee, on October 30, 1997. Had she started with Children's on January 1, 1997, she would have been employed with Children's for ten months prior to her letter to Dr. Boat regarding Dr. Ma.

[6] Her full testimony was that the Department of Pediatrics Reappointment, Promotion and Tenure Committee was the first level of review for someone who is being considered for tenure. Subsequently, "the departmental committee recommends to the Chair, the Chair of the Department of Pediatrics reviews the dossier and decides whether to approve or not and recommends to the College of Medicine's RPT Committee. They then, after a review of the dossier, make a recommendation to the Dean [of the College of Medicine]. And the Dean does the same, and makes a recommendation to the provost. The provost makes a recommendation to the president. And then, finally, the president makes a recommendation for the Board of Trustees."

Children's.[7]  Thus, it is an exaggeration of Dr. Degen's position in 1997 to say that she understood and executed Children's contractual intent, as the majority suggests.

{¶43} Second, Dr. Degen's testimony on the meaning of tenure as it was at Children's was ambiguous, and the concept of tenure she described is not based on any documentation, writing, or conversations with anyone at Children's.  Instead, Dr. Degen references her personal view of tenure in her testimony, which she admits was informed by the tenure policy of academia in general and that of other institutions.  In her affidavit, she also indicates that her understanding was informed by "medical and academic institutions of similar nature and purpose."[8]  Nothing in her testimony or affidavit demonstrated that

---

[7] The full exchange between Dr. Ma's counsel, Marc Mezibov, and Dr. Hostetter—as it pertained to Dr. Degen—was, as follows:

> [Mezibov]: And do you know what Dr. Degen's understanding of tenure was at the time she served on that committee?
> [Hostetter]: I can't speak to that.
> [Mezibov]: You never discussed it with her?
> [Hostetter]: Not at the time she signed this letter.
> [Mezibov]:  Yeah.  In 1997, I take it you were not at the University –
> [Hostetter]: Correct.
> [Mezibov]:  -- of Cincinnati nor at Children's Hospital, correct?
> [Hostetter]: Correct.
> [Mezibov]: All right.  So what Dr. Degen understood she was granting or recommending for Dr. Ma is something she has not shared with you, or you have not –
> [Hostetter]: Correct.
> [Mezibov]:  -- sought from her?  You wouldn't question Dr. Degen's knowledge of what these – what the rules and policies of these two institutions were with respect to tenure in 1997, would you?
> [Hostetter]: No.  Because she specifies that the promotion here [in the letter to Dr. Boat] is associate professor of pediatrics with tenure, dash, affiliated.
> [Mezibov]: Right.  And you would –
> [Hostetter]: And that refers to tenure at Cincinnati Children's.
> [Mezibov]: Fair enough.  And you would have no doubt that Dr. Degen had some understanding of what tenure meant as an affiliated faculty member?
> [Hostetter]: I think Dr. Degen would have – I can't say what Dr. Degen's understanding was.
> [Mezibov]: You would have no reason to question her knowledge, would you?
> [Hostetter]: I think at that time Dr. Degen understood what promotion to associate professor of pediatrics with tenure, dash, affiliated meant.

[8] It is worth noting here that tenure as a matter of law is defined by the terms of the employment agreement. *See Rehor v. Case W. Res. Univ.*, 43 Ohio St.2d 224, 331 N.E.2d 416 (1975). Accordingly, an understanding of the term that is informed from academia in general, or by the "traditional meaning and usage" as the trial court put it—much of which was shaped through litigation involving public universities and the AAUP—has no bearing on how the term is used and defined in an employment agreement between an individual and a private institution.

*Children's view* of the term tenure was continued employment absent just cause for termination. Though she purported to testify as someone having firsthand observation and experience, she never actually described any specific instances where Children's limited its ability to terminate tenured employees. While she gives herself as an example of a tenured professor who was not terminated when she did not maintain funding for her research—to contradict the idea that a lack of funding could lead to termination, she admitted that per an agreement with Dr. Boat, she took on a purely administrative role at Children's prior to her funding ending. In other words, she renegotiated her employment agreement so that maintaining funding was no longer a condition of her employment.

{¶44} Third, and perhaps most important, Dr. Degen's testimony was that her view of tenure was informed from the time the RPT Committee deemed Dr. Ma eligible for tenure—in 1997—to the time she left Children's—in *2015*.[9] She did not rely on her understanding in 1997-99 (the "operative timeframe") as the basis for her opinion. This is significant because the majority excludes as irrelevant any evidence that was not derived contemporaneously with Dr. Ma's application for tenure—except for the testimony of Dr. Degen. For instance, according to the majority, Dr. Hostetter's testimony is irrelevant because she wasn't at Children's until 2010, the Affiliation Agreement is irrelevant because it is dated 2001, Children's Human Resources Policy is irrelevant because its effective date is listed as January 1, 2015, Dr. Strauss's testimony is irrelevant because he started at Children's in 2007 and knew only of Children's policies in effect since 2007, and Dr. White's testimony is irrelevant because he started in 2014. Simply put, Dr. Degen is not entitled to the deference that the majority gives her simply by virtue of her presence at Children's in 1997-99.

---

[9] Dr. Degen was asked by Ma's counsel, "But at the time Dr. Ma received this letter, at the time you deemed him eligible for tenure, and as of the time that you left, did you have a view as to whether or not he had been awarded tenure that conformed with your understanding of what tenure meant?" to which Dr. Degen answered, "Yes."

28

{¶45} Dr. Hostetter, testifying as Children's corporate representative under Civ.R. 30(b)(5), rejected the notion that an award of tenure meant Dr. Ma was no longer employed at-will, and put forth two conditions of employment at Children's to contradict Dr. Ma's and Dr. Degen's understanding that it did: (1) the Affiliation Agreement that indicates Children's does not follow the AAUP bargaining agreement which does provide permanent continuous tenure, and (2) a requirement that all faculty must sustain their own funding, which Dr. Hostetter testified to mean that tenured employees can be terminated at any time if they do not reach a certain level of funding for their programs.[10]

{¶46} Neither the Affiliation Agreement nor the funding requirement was explicit as to what tenure meant or to how it might have modified the term tenure, but both conditions implied that the character of Dr. Ma's employment was not that of permanent employment—or, continued employment absent just cause for termination. The Affiliation Agreement was entered into by Children's with the University of Cincinnati College of Medicine in 1926 and revised in 1956 and 2001. The agreement provides that "[a]ffiliated faculty members employed by [Children's] * * * are governed by the rules and regulations of [Children's], and are not represented by the AAUP." The agreement also states that "the University has no tenure obligation with respect to those [Children's] employees." Dr. Hostetter testified that this agreement meant, among other things, that Children's employees were not eligible to participate in the AAUP collective-bargaining agreement that is typical for faculty of public universities. *See, e.g., Giles v. Univ. of Toledo*, 286 Fed.Appx. 295, 300 (6th Cir.2008) (interpreting an AAUP union collective-bargaining agreement with respect to rights of tenured faculty at a public university). The 2001 version of the

---

[10] The majority limits any persuasiveness of Dr. Hostetter's testimony by defining the operative timeframe as 1997-99, when Dr. Ma was awarded tenure, and Dr. Hostetter did not join Children's until 2010. But her start-date is irrelevant. As explained below, the funding requirement at Children's predated Dr. Ma's award of tenure, and the Affiliation Agreement existed when Dr. Ma renegotiated his contract. Dr. Hostetter's testimony is based, in part, on her review of the documents pertaining to these conditions.

Affiliation Agreement was the only version entered into evidence, and Dr. Hostetter admitted that she did not know whether the agreement was the same in 1992—but it certainly existed when Dr. Ma renegotiated his contract in 2007. The sustained-funding requirement was introduced to Dr. Ma in his 1992 offer letter, and described in Children's Faculty Guidelines on the Criteria for Appointment, Reappointment, Promotion and Tenure.

{¶47} On the sustained-funding requirement, Dr. Degen even testified that once an employee obtains tenure, the employee is still required to obtain continuous external funding.[11] She does not, however, go so far as to say a tenured employee can be terminated for failing to obtain funding, like Dr. Hostetter explained. In fact, Dr. Degen's position was that an employee can remain employed at Children's if they simply make a good-faith effort to obtain funding, which could mean trying and trying for several years to obtain funding but failing. Conversely, Dr. Hostetter testified that a tenured employee can be terminated at any time if they do not reach a certain level of funding.

{¶48} The course of dealing between the parties on the sustained-funding requirement seemed to suggest that Dr. Degen's view was not that of Children's—that an employee could have been terminated for not meeting funding requirements despite a tenured status. Dr. Ma submitted several faculty evaluations from his time at Children's. In each one, the requirement to maintain funding was a significant part of the evaluation. For example, in his 2014 faculty evaluation, the Division Director's narrative summary, in pertinent part, stated:

> Generally, Jun's publication efforts are not a concern, as he has one of the
>
> strongest track records of publishing in the highest quality journals of any

---

[11] When asked by Children's counsel, "[I]s it your testimony that once you get promoted, or once you get tenured, it's no longer a requirement?" Dr. Degen answered, "No."

BMI faculty, and as first or senior author. However, Jun continues to struggle with translating this into successfully obtaining independent funding. * * * **Substantial support for his program is required given his status, high salary, and lack of significant teaching and leadership burden.** Obtaining a second substantial external funding source (or several smaller sources) and renewing his current R01 should be his major emphasis for 2015.

(Emphasis added.) The Division Director's narrative summary in Dr. Ma's 2015 faculty evaluation was a little more dire:

Of greater concern is that Jun's external funding will end later in 2016, that he has not reached his goal target of 40% for this evaluation year, that his funding success has increased only marginally despite increased concentration in this area, that this has been a chronic challenge, and that his funding level is far lower than would be expected for a faculty member at his level.

* * *

**Jun's current research funding is inadequate for his position and is not sustainable for the Division or CCRF.** This, rather than publications, should be his major focus. **In 2016, Jun will need to show much more success in garnering research support for his salary and laboratory, or he will need to explore alternatives.**

(Emphasis added.)

{¶49} Absent from Dr. Ma's faculty evaluations is Dr. Degen's notion that Dr. Ma could continue indefinitely merely trying to obtain funding. Rather, the Division Director insinuated that failing to sustain funding could result in termination. Significantly, the

31

Division Director's notes did not state that Dr. Ma's tenured status had anything to do with Dr. Ma's continued employment with Children's, or that it somehow relieved him of Children's requirement that he sustain his funding.[12]

{¶50} At this point, the extrinsic evidence is in dispute and thus does not resolve the ambiguity in the term tenure. Still unknown is whether Children's award of tenure to Dr. Ma limited its ability to terminate him. Dr. Degen, Dr. Ma, and Dr. Rubin said that it did, while Dr. Hostetter, Dr. White, and Dr. Strauss said that it did not. And, among the things still undetermined is whether Children's funding requirement, which existed in 1992 when Dr. Ma was offered the position at Children's and is recurrent in his later faculty evaluations, modified the term tenure, and if so, how.[13] Dr. Degen said that it did not, while Dr. Hostetter said that it did. This ultimately means there are genuine issues of material fact as to whether the employment relationship between Dr. Ma and Children's was ever modified from one which was terminable at-will into one terminable only for just cause.

{¶51} Lastly, missing from the majority opinion is any mention of the substantive law of the claims being litigated: Ohio employment law. After all, the key to a summary judgment is that there must be no genuine issue as to any material fact, and a "material fact" depends on the substantive law of the claim being litigated. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To that point, it is important to note that Ohio has long recognized the employment-at-will doctrine and there

---

[12] The majority characterizes my examination of this requirement as "fram[ing] [it] as irreconcilable with a just cause concept of tenure." To the contrary, I am not making a judgment one way or another. The two provisions could very well be reconcilable. But on the record before us at the summary-judgment stage, the inference in the funding requirement is that Children's did not intend to limit its ability to terminate Dr. Ma when it awarded him tenure, as it later fired him for not meeting the funding requirement that had existed since the time of his hiring and made no mention of tenure in any of the faculty evaluations leading up to his termination. Plus, my examination of these records revealed that Dr. Degen's opinion that the funding requirement was more of a recommendation rather than a condition of employment was unsupported.

[13] The majority noted that this argument was difficult to find in Children's brief, *see* ¶ 26, but the argument is explicitly made on page 18 and the term "funding" is mentioned 31 times. The funding requirement is also discussed in Children's Response in Opposition to Summary Judgment on pages 7-10, and again later in addressing Dr. Ma's promissory-estoppel claim.

exists a strong presumption in favor of a contract terminable at-will. *See Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985). Also, "[t]he general rule in Ohio is that unless otherwise agreed to by the parties, an employment agreement purporting to be permanent or for life, or for no fixed time period is considered to be employment terminable at the will of either party." *Casale v. Nationwide Children's Hosp.*, 682 Fed.Appx. 359, 364 (6th Cir.2017), quoting *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1040 (6th Cir.1992). The Ohio Supreme Court has said that implied contractual provisions can limit an employer's discretion on discharge. *Mers* at paragraphs two and three of the syllabus. But in such a case, "[t]he facts and circumstances surrounding an * * * employment-at-will agreement, including the character of the employment, custom, and course of dealing between the parties, company policy, or any other fact which may illuminate the question, can be considered by the trier of fact in order to determine the agreement's explicit and implicit terms concerning discharge." *Id.* at paragraph two of the syllabus.

**{¶52}** Here, the majority dismisses the Affiliation Agreement and Children's Human Resources policy with ease, when there is extensive authority that says rules and policies become implied terms of faculty employment contracts. *See, e.g., Rehor v. Case W. Res. Univ.*, 43 Ohio St.2d 224, 229, 331 N.E.2d 416 (1975); *Perry v. Sindermann*, 408 U.S. 593, 601-602, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). While additional terms promulgated in rules, policies or employee handbooks typically require additional consideration, *see, e.g., Pastella v. Rite Aid of Ohio, Inc.*, 7th Dist. Mahoning No. 93 C.A. 236, 1995 WL 763304, *5 (Dec. 21, 1995), it seems that there was additional consideration in this case. Dr. Ma renegotiated his contract with Children's in 2007, foregoing additional employment with the University of Houston. *See Helle v. Landmark, Inc.*, 15 Ohio App.3d 1, 11, 472 N.E.2d 765 (6th Dist.1984) (employees' forbearance from seeking other employment served as consideration). Wouldn't this new consideration encompass the 2001 Affiliation Agreement

33

as one of Children's employment policies then in effect?  Therefore, isn't the Affiliation Agreement yet another piece of evidence to the contractual relationship between Dr. Ma and Children's in dispute?[14]  For that matter, Dr. Strauss approved of the provisions in Dr. Ma's renegotiated contract.  Isn't Dr. Strauss's testimony on a key term subsumed in the renegotiated contract, wherein he specifies that tenure does not guarantee employment at Children's, not only relevant but also further demonstrative of extrinsic evidence in dispute?

{¶53} The majority states the record established that the parties altered these default rules, but I disagree.  At this stage, the facts and circumstances surrounding Dr. Ma's promotion to a tenured professor proved only that Children's intended to promote Dr. Ma as an exceptional employee and to reduce the frequency of rigorous evaluations—not that it intended to limit its ability to terminate him.  The letters to Dr. Ma regarding tenure made no mention of the circumstances under which he could be terminated, nor did they contain statements suggesting continued employment absent just cause for termination.  Dr. Ma and Dr. Degen could not point to any writing limiting Children's ability to terminate Dr. Ma, nor could they recall any discussions with anyone at Children's regarding the circumstances under which Dr. Ma's employment could be terminated.  Dr. Degen testified to her personal view of the meaning of tenure, which was admittedly based on how the term is used in academia in general rather than how it was used at Children's, and gave an account about the funding requirement at Children's that was not supported by the record.  Accordingly, Dr. Ma could not identify portions of the record that demonstrated the absence of a genuine issue of material fact on the essential elements of Children's claims, as he was required.  *See Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996) (discussing the moving party's burden on summary judgment).  But even if Dr. Ma's position had been supported, I

---

[14] The majority asserts that the Affiliation Agreement "by its terms does not apply to Dr. Ma," but by its terms it applies to all "affiliated faculty members employed by [Children's]."  This would include Dr. Ma, as it was undisputed that he was an affiliated faculty member employed by Children's.  Accordingly, the record *does not* establish that the Affiliation Agreement did not apply to Dr. Ma.

believe that Children's put forth evidence that suggested his employment remained at-will—namely, testimony to the course of dealings between Children's and Dr. Ma, the funding requirement that existed from the time of Dr. Ma's hiring to his termination, and the company policies that existed at the time of his termination.

{¶54} The majority's analysis of the material facts of this case without the context of the substantive law is puzzling, as is the majority's flippant answer that the parties evidently altered the default rules of employment law. Nevertheless, with the material facts in dispute, as demonstrated above, I believe the trial court had more work to do in interpreting the employment agreement in question.

**Summary Judgment Rule**

{¶55} Besides failing to recognize the dispute in the extrinsic evidence and thus a genuine issue of material fact, I believe the majority failed to adhere to the summary judgment rule in another respect. Summary judgment is a procedural device designed to terminate litigation where there is nothing to try, therefore it must be awarded with caution. *See Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-359, 604 N.E.2d 138 (1992). The rule is often cited in a mechanical fashion, but it is important to consider each part of the rule with due care. "Summary judgment is appropriate if (1) no genuine issue of material fact exists for trial, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, *who is entitled to have the evidence construed most strongly in his or her favor.*" (Emphasis added.) *Wal-Mart Realty* at ¶ 8, citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977); *see* Civ.R. 56(C).

{¶56} In this case, I do not believe that the majority construed the evidence in favor of Children's—which Children's was entitled to as the nonmoving party. Under the rule, "[e]ven the inferences to be drawn from the underlying facts contained in the evidentiary

materials, such as affidavits and depositions, must be construed in a light most favorable to the party opposing the motion." *Hannah v. Dayton Power & Light Co.*, 82 Ohio St.3d 482, 696 N.E.2d 1044 (1998), citing *Turner v. Turner*, 67 Ohio St.3d 337, 341, 617 N.E.2d 1123 (1993). The majority, however, dismisses the inferences in the evidence. This is particularly true of the sustained-funding requirement. The inference in the funding requirement was that maintaining funding was a condition of employment—a condition that if an employee did not meet, the employee would be terminated—and that tenure did not necessarily alter that requirement.

{¶57} For example, Dr. Ma's 1992 offer letter states, in relevant part:

You will be eligible for promotion and the granting of tenure no later than seven years after your initial appointment. Actual consideration for tenure would be no later than the fifth year of your appointment.

* * *

Each year you will be asked to develop a budget and distribute institutional funds prospectively for that year. We expect you to continue to apply for external research support. Beginning at year four, we will evaluate your progress and will provide your salary, technical assistance, and some supplies through year five if you have not yet succeeded in obtaining external funding to support your program.

* * *

After year five you will be treated in the same way as all other faculty with regard to policies then in force.

* * *

In exchange for our support, we expect you to develop an independent research program and to maintain external funding for your research. Such

36

funding is usually obtained from the National Institutes of Health, but is highly competitive. We also encourage you to write research grants collaboratively with established faculty. We try to purchase most large capital equipment using institutional resources and we provide what we call bridge funding for a year or two when established faculty have lost their support. **However, all of our faculty must sustain their individual research programs with external funds from federal granting agencies.** We believe you will remain competitive for research funds. **Part of your annual performance review relates to the quality of your research and the extent of success in attracting support for your program.**

(Emphasis added.)

{¶58} The majority ignores the inference because the letter does not state any consequences for falling short of external funding—i.e., the letter does not say "you will be fired if you do not obtain external funding to support your program." But does it really need to say that—can't a highly intelligent pediatric researcher deduce the consequences for not meeting funding requirements? How would he support his program, pay his salary, or support his lab? Would he remain employed with a salary of zero dollars? If failing to attract support for his program through funding meant that he would receive a poor performance review (as he did), wouldn't enough poor performance reviews lead to his termination (as it did)? At the very least, under the summary judgment rule, the inference should have been construed in a light most favorable to Children's, leaving the matter to be resolved at a trial.

{¶59} The purpose of summary judgment is not to try the issues of fact, as the majority did here, "but rather to determine whether triable issues of fact exist." *Killilea v. Sears, Roebuck & Co.*, 27 Ohio App.3d 163, 167, 499 N.E.2d 1291 (10th Dist.1985). I believe

37

that they do exist and would remand this matter to the trial court for a determination on the facts in dispute.

Please note:

The court has recorded its entry on the date of the release of this opinion