[Cite as *Ma v. Cincinnati Children's Hosp. Med. Ctr.*, 2024-Ohio-5079.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|                                                          |   |                                              |
|----------------------------------------------------------|---|----------------------------------------------|
| JUN MA, PH.D.,                                           | : | APPEAL NO. C-240166<br>TRIAL NO. A-1606910   |
|     Plaintiff-Appellant,              | : |                                              |
|                                                          | : |                                              |
|   vs.                                           | : | *O P I N I O N.*                             |
|                                                          | : |                                              |
| CINCINNATI CHILDREN'S<br>HOSPITAL MEDICAL CENTER,         | : |                                              |
|                                                          | : |                                              |
|     Defendant-Appellee.               | : |                                              |
|                                                          | : |                                              |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: October 23, 2024

*Mezibov Butler, Marc D. Mezibov, Brian Butler, and Dennis Gleason,* for Plaintiff-Appellant,

*Taft Stettinius & Hollister, LLP, Beth A. Bryan, Annie McClellan, and W. Stuart Dornette,* for Defendant-Appellee.

**BERGERON, Judge.**

{¶ 1}   This employment dispute spans almost eight years of litigation, three appeals, and one trial.   Without a formal written employment agreement, the parties dispute the nature of the employment agreement between them, particularly what duties were bestowed on each side.  After two previous appeals, the parties finally proceeded to a six-day jury trial, and the jury ultimately found for the defendant-employer in a 6-2 vote.   The employee-appellant, Jun Ma, Ph.D., now appeals to this court, presenting three assignments of error. After a comprehensive review of the record, however, we uphold the jury's verdict, overrule all three assignments of error, and affirm the lower court's judgment on all fronts.

I.

{¶ 2}   The crux of this dispute concerns whether Dr. Ma, a professor and researcher at defendant-appellee Cincinnati Children's Hospital Medical Center ("CCHMC"), had to maintain a specific funding level through outside sources to keep his job.  Unfortunately, the parties did not specify any such requirements at the outset of their relationship; hence their litigation odyssey.

{¶ 3}   In September 1992, Dr. Ma relocated to CCHMC, accepting a position in the Department of Pediatrics as a researcher with professorship duties.   He negotiated his original contract with Dr. John Hutton, and during trial, Dr. Ma emphasized the significance of this position because of the tenure-track opportunity it presented, which, in his opinion, afforded him heightened job security.   During trial, Dr. Ma testified that he understood his original employment agreement to require him to obtain funding for his lab and the associated costs for running it after several startup years, but he did not believe that he needed to cover a portion of his own salary.  He understood his salary as "hard money," not requiring outside funding.

{¶ 4} Several years later, in 1997, Dr. Ma was promoted by the Reappointment, Promotion, and Tenure ("RPT") Committee to an Associate Professor for Pediatrics and was granted tenure-affiliate status. With this status, CCHMC expected that Dr. Ma would begin covering the costs of his lab and a portion of his own salary. However, CCHMC did not have a written tenure policy in place that included important details like these. During trial, Dr. Ma and other individuals employed by CCHMC offered their belief that, despite the lack of a written policy, they understood tenure to mean that CCHMC was committed to that individual's research goals and provided job security, as those individuals could only be terminated for "just cause." But without a written policy regarding tenure, of course, we have no elaboration on what the parties believed "just cause" meant. Additionally, the term was never defined by any of the employment letter agreements signed by Dr. Ma, other hospital policies, or anyone within the department. This lack of a written policy defining the tenure policy, and consequently, what constituted "just cause," would prove central to the trial down the road.

{¶ 5} In 2007, the University of Houston Medical Center recruited Dr. Ma to join their faculty. Seeing if he could enhance his current position, Dr. Ma informed CCHMC of Houston's offer, and it counteroffered with a raise, a full-time tenured professorship position, and a transfer to the Division of Biomedical Informatics in order to keep him in Cincinnati. Dr. Ma ultimately accepted CCHMC's counteroffer and signed a new offer letter (another letter, unfortunately, wanting in details on the concepts at issue in this litigation). As a tenured employee, Dr. Ma was required to participate in annual reviews, as opposed to the periodic reappointments he faced under his original contract. These annual reviews were conducted by one of the higher-ups within Dr. Ma's department. Around 2009, issues began to arise between Dr. Ma and CCHMC, manifested in these reviews.

3

**{¶ 6}** In Dr. Ma's annual reviews from approximately 2009 to 2015, CCHMC and its department chairs raised various concerns with his continuous lack of outside funding to cover his lab costs and salary. Several individuals that conducted his annual reviews throughout that period echoed the point—Dr. Ma was not doing enough to receive outside funding grants, which inflicted significant annual costs on CCHMC. Despite this repeated documentation of Dr. Ma's failures and the conversations during his annual reviews, he never questioned CCHMC's concerns or refuted that this was a duty of his under the employment contract.

**{¶ 7}** The same concerns haunted Dr. Ma until 2016, when the chair of his division, Dr. Pete White, informed him that his employment was terminated with CCHMC. Dr. Ma objected to CCHMC's ability to terminate him because, as he understood his tenured position, he could only be terminated for just cause. Initially, Dr. White insisted that he was actually an at-will employee who could be fired at any time for almost any reason. However, after going back-and-forth several times with Dr. Ma and other personnel at CCHMC, Dr. White informed Dr. Ma that the decision was due to budgeting issues within the department, exacerbated by his lack of funding. Although Dr. White gave Dr. Ma nine months to figure out his next steps, Dr. Ma immediately filed suit against CCHMC, alleging fraudulent inducement and promissory estoppel, and requesting declaratory and injunctive relief. Several years of litigation and appeals ensued.

**{¶ 8}** *Ma I.* In the initial stages of this case, Dr. Ma moved for injunctive relief and summary judgment on his claims, essentially asserting that he was not an at-will employee and that CCHMC lacked just cause to terminate his employment. The trial court granted Dr. Ma's motion, holding that, as a tenured employee, he could only be fired for just cause and that he was entitled to due-process-like procedural safeguards before he could be terminated,

such as a meaningful opportunity to be heard. Unhappy with that decision, CCHMC appealed. At that point, this Court reversed in part, finding that while Dr. Ma was a tenured employee, he had no contractual basis for the procedural safeguards outlined by the trial court. *Ma v. Cincinnati Children's Hosp. Med. Ctr.*, 2020-Ohio-1471, ¶ 38 (1st Dist.) ("*Ma I*"). While the meaning of "tenure" under the agreement was ambiguous, this court held that Dr. Ma supported his position that it entitled him to removal only for just cause with the testimony of Dr. Sandra Degen, who was on the RPT Committee at the time he received tenure-affiliate status, and that CCHMC failed to contest that evidence. *Id.* at ¶ 20-22. Because of the lack of contradictory evidence, we saw no genuine dispute as to whether tenure meant that Dr. Ma could only be terminated for just cause. *Id.* at ¶ 27. We accordingly remanded for further proceedings.

{¶ 9} So far, so good. Dr. Ma is a tenured employee.

{¶ 10} *Ma II.* Following the first appeal, the trial court granted summary judgment in favor of CCHMC, holding that CCHMC had just cause to terminate Dr. Ma. The exact definition of "just cause" under the agreement, again, became an issue of interpretation based on the series of documents that formed the agreement. In reversing the trial court's grant of summary judgment, we held that both parties presented conflicting evidence as to their interpretation of "just cause" under the contract, and because of that, the trial court should not have granted summary judgment at that juncture. *Ma v. Cincinnati Children's Hosp. Med. Ctr.*, 2023-Ohio-1727, ¶ 24 (1st Dist.) ("*Ma II*").

{¶ 11} Back to the drawing board for round three, and a trial.

{¶ 12} *Ma III.* After the second appeal, the case proceeded to a six-day jury trial, where the jury ultimately found for CCHMC. The main issue presented to the jury was whether CCHMC had just cause to terminate its relationship with Dr. Ma. Ultimately, the

jury determined that CCHMC *did* have just cause to terminate Dr. Ma's employment because he failed to deliver "on expectations that were repeatedly addressed and unrefuted in annual reviews, which were acknowledged by [Dr. Ma]." Dr. Ma now appeals again, presenting three assignments of error regarding the jury instructions, the manifest weight of the evidence, and evidence and testimony admitted regarding his Chinese heritage and his post-CCHMC employment.

## II.

{¶ 13} In his first assignment of error, Dr. Ma raises two issues with the jury instructions. Whether a trial court gives a particular jury instruction generally rests within its discretion, and as such, instructions "will not be disturbed upon appeal unless the record reflects that the trial court abused its discretion." *State v. Houston*, 2010-Ohio-2367, ¶ 20 (1st Dist.). An abuse of discretion occurs when the trial court "exercise[es] its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. A particular "jury instruction must be viewed in the context of the entire charge rather than in 'artificial isolation.'" *Houston* at ¶ 20.

## A.

{¶ 14} Dr. Ma first challenges how the trial court defined "just cause," zeroing in on what documents the jury could consider in determining the meaning of that concept.

{¶ 15} In defining just cause in the jury instructions, the trial court provided:

"Just cause" has no precise definition, but generally it refers to neglect of duty, dishonesty, or unfaithfulness on the part of the employee. Therefore, what constitutes "just cause" depends on the context and unique facts of each case . . . In answering this question you may consider the testimony of the witnesses, their credibility, and their ability to speak to this issue, *the substance of any*

6

*documents that formed the basis of the employment contract between Dr. Ma and Children's Hospital* or explained that relationship, including the 1992 offer letter, Dr. Ma's acceptance, the 1997 tenure document, the 2007 retention letter, and **any other evidence you conclude forms the basis of the contract** . . .

(Emphases added.)

{¶ 16} Dr. Ma believes that this instruction, specifically the bolded portion, gave the jury free reign to rewrite the contract as it wished, despite this Court's previous holding that four documents sat "at the heart" of this agreement—the 1992 offer letter, Dr. Ma's acceptance, the 1997 tenure documents, and the 2007 retention letter. *See Ma II*, 2023-Ohio-1727, at ¶ 16 (1st Dist.). Therefore, Dr. Ma believes that this Court's previous holding essentially cabined the time period to which there is relevant evidence and limited what documents could be considered part of the agreement, rendering this instruction prejudicial and an abuse of the trial court's discretion.

{¶ 17} To be sure, this court noted that the 1992 offer letter, Dr. Ma's acceptance, the 1997 tenure document, and the 2007 retention letter sat "at the heart of" this contract, but we did not go further than that because the parties did not have an integrated agreement, and we were simply responding to the issues presented to us in those respective appeals. And given the ambiguous nature of the concept of "tenure" in the agreement, the parties might have found means of elucidating the nature of the contract elsewhere in the record after we set forth the appropriate legal standard. After all, none of these documents explicitly defined "just cause," and similarly, CCHMC never "put forth any tenure policy or document defining or otherwise explaining the term" as it was understood between 1992 and 1998. *Id.* at ¶ 16. Since the term was left undefined by the relevant documents and policies, this court noted

that it necessitated a consideration of extrinsic evidence in order to decipher the meaning of "just cause" as it was understood by these parties. *Id.* at ¶ 20. After considering the ambiguity of "just cause" in the contract and the competing evidence of what Dr. Ma's obligations were, this court made it clear that "a jury [would] ultimately" have to decide the facts and whether CCHMC had just cause to terminate Dr. Ma. *Id.* at ¶ 24. We emphasized that our reversal was "not to say that Dr. Ma's ongoing failure to obtain sufficient funding is not just cause to terminate his employment . . . [A] jury may well find that Children's had just cause . . . " *Id.* at ¶ 25. In other words, all of this posed a jury question.

{¶ 18} Dr. Ma retorts, however, that the trial court asked the jury the *wrong* question, enabling the jurors to engage in mischief and reframe the parties' agreement. But we don't see it that way. First, although Dr. Ma takes issue with the documents the trial court included in its "just cause" instruction, he does not attack how the trial court actually defined "just cause." Dr. Ma never contended that the definition—which was the heart of the case—itself misled the jury, constituted an abuse of the trial court's discretion, or was in any way prejudicial to him. Nor could he—Dr. Ma himself proposed this definition of "just cause" in his own proposed jury instructions. More importantly, he proposed the italicized language in paragraph 15 above, which doesn't seem too different from the bolded language about which he complains. We fail to see a material difference between "any documents that formed the basis of the employment contract between Dr. Ma and Children's Hospital or explained that relationship," and "any other evidence you conclude forms the basis of the contract." In other words, by proposing the former, Dr. Ma cannot, at this point, claim any serious prejudice from the latter, even if the trial court should have used different verbiage.

{¶ 19} Second, this case presented an issue where extrinsic evidence was necessary to elucidate the meaning of the contract. It is arguable that the trial court should have said

8

something that rendered this instruction more precise and carefully focused the jury's attention on their duty in sifting through the extrinsic evidence. And while maybe that would have made the lawyers happy, we doubt that a lay jury would appreciate the difference in the nuance. On this record, in light of the entirety of the jury instructions and the language proposed by Dr. Ma, we cannot say that the trial court abused its discretion in providing this instruction.

B.

{¶ 20} In a related argument, Dr. Ma next takes issue with how the trial court framed the burden of proof regarding "just cause" in the jury instructions. He maintains that "just cause" constitutes an affirmative defense under Ohio law, and therefore, the trial court's jury instructions should have placed the burden of proving such on CCHMC, rather than himself.

{¶ 21} Dr. Ma argues that if such a burden is placed on plaintiffs in similar cases, it would require them to prove both a positive and a negative. It would require plaintiffs to prove that they fulfilled their explicit contractual duties while also negating that they didn't do anything that might warrant termination. To Dr. Ma, this burden shifting is incongruous with one of the foundational concepts of contract law—that the plaintiff only needs to prove that they performed under the contract.

{¶ 22} Although we understand the point, we do not agree on the present record for several reasons. Initially, as even Dr. Ma acknowledges, whether "just cause" in employment contract disputes constitutes an affirmative defense, which would require placing the burden on the employer, has not been conclusively determined in Ohio. Case law is fairly sparse on this point, which frankly should not come as much of a surprise, given our recognition in the previous case that "just cause" does not have any ironclad definition in Ohio case law. *Ma II*, 2023-Ohio-1727, at ¶ 19 (1st Dist.). What constitutes "just cause" in each case may vary given

9

the terms of the employment contract at issue, so the analysis of where the burden falls may also differ in each case. *See Beckman v. Garrett*, 66 Ohio St. 136, 142 (1902) (even though the Supreme Court initially held that it was "sufficient for the employer to show that the employee was guilty of a default," it ultimately held that the nature of the employee's misconduct did not require the employer to do anything more than refute that the employee fulfilled their contractual duties); *compare McElroy v. Snider Co.,* 2000 Ohio App. LEXIS 2918, *8 (8th Dist., June 29, 2000), quoting *Beckman* at syllabus ("'[I]t is sufficient for the employer to show that the employee was guilty of a default in duty . . . '").

{¶ 23} Second, in some circumstances, as in this case, the issue of whether an employer has "just cause" to terminate an employee will just be the other side of the coin of the employee's performance of their duties under the contract. Reducing this case to its simplest essence, Dr. Ma insists that he fully performed, whereas CCHMC claims he didn't. And there is no question that the employee carries the burden to prove that they performed their duties under the contract in order to successfully assert a breach-of-contract claim. To carry that burden in this case, Dr. Ma essentially needed to prove that CCHMC lacked just cause in terminating his employment due to insufficient funding. Because of this overlap, it could unduly confuse the jury to give two incongruous instructions about where the burden falls for the same issue.

{¶ 24} A large portion of this case, including the evidence and witness testimony, centered around whether Dr. Ma had a contractual duty to cover a portion of his salary and his lab costs with outside grant funding, which the jury found that he did. Therefore, the burden of proving a fulfillment of this duty fell on Dr. Ma per the agreed-upon aspects of the jury instructions, which the jury determined he did not meet. Because Dr. Ma bore the burden of proving that he fulfilled his contractual funding requirements, it was his burden to prove

that CCHMC lacked just cause to fire him for this reason. Either way, as inferred from the jury's "just cause" interrogatory response, CCHMC provided sufficient evidence on its own behalf that funding was a duty under Dr. Ma's contract, and he continuously failed to meet this duty for several consecutive years. We can, of course, appreciate that different flavors of "just cause" might dictate different answers to this burden allocation question, but we resist the temptation to speculate on those scenarios.

{¶ 25} On this record, we decline to recognize an inflexible rule of which side bears the burden of proving just cause in an employment dispute. Other types of "just cause" and other agreements may persuade us to do so, but we'll wait and sort that out down the road. All we decide here is that, given the fact-specific inquiry at hand, Dr. Ma failed to establish that the trial court abused its discretion when it gave the "just cause" jury instruction. We accordingly overrule his first assignment of error on both grounds.

III.

{¶ 26} In his second assignment of error, Dr. Ma challenges the trial court's judgment as against the manifest weight of the evidence presented at trial. Essentially, Dr. Ma revisits his previous argument that the trial court's lack of restriction in what the jury may consider part of the contract (and the sprawling time period) resulted in a verdict and judgment that ran counter to the manifest weight of evidence.

{¶ 27} When deciding whether a judgment entered by the trial court is against the manifest weight of evidence, the appellate court "must always be mindful of the presumption in favor of the finder of fact." *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 21. The manifest-weight-of-evidence standard refers to whether there is a "'*greater amount of credible evidence* . . . to support one side of the issue rather than the other.'" (Emphasis in original.) *Id.* at ¶ 12, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In doing so, "the

appellate court sits as a '[thirteenth] juror.'" *Id.* at ¶ 13. The court must look to and weigh the "'evidence and all reasonable inferences, consider[ing] the credibility of witnesses and determine[] whether . . . the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice'" so as to justify reversal. *Id.* at ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist. 2001). Needless to say, this poses a considerable burden for the party challenging the verdict to overcome, for obvious reasons. We have carefully reviewed the transcript, and to be sure, this was a close case. While both sides scored ample points, we are unable to say that the manifest weight of the evidence pointed the other direction.

{¶ 28} Dr. Ma primarily leans on Dr. Degen's testimony in asserting that the greater weight of credible evidence supported his position that external funding to cover a portion of his salary was not a contractual requirement of his. Again, Dr. Degen was the only individual who testified during trial that played a role in Dr. Ma's promotions at CCHMC, as she served on the RPT Committee that granted him tenure-affiliate status in 1998. Therefore, he asserts that she is the only witness capable of explicating his contractual obligations at the relevant point in time. During her testimony, she explained that the evaluations were not a basis for termination or alteration of employment contract terms, and because of this, Dr. Ma maintains that the jury should not have factored them into its calculus. Therefore, his reasoning goes, because CCHMC relied on the evaluations that noted Dr. Ma's failures in order to support its termination, he provided the greater weight of credible evidence. Additionally, Dr. Ma features the testimony of Dr. White, who said that during his time there, Dr. Ma was the only investigative faculty member he terminated for a lack of funding, insinuating then that such funding was not really a contractual requirement. Dr. Ma packages

all of this together to demonstrate that he provided the greater weight of credible evidence and supported his position.

{¶ 29} The problem, of course, is that this tells only one side of the story. CCHMC is quick to showcase its own evidence, highlighting testimony from Drs. Boat, Strauss, and White, who were, at various times, in positions managing employee contracts and relations like Dr. Ma's. Dr. Boat began his career at CCHMC in 1993 as the chair of the Department of Pediatrics and the Director for Research Foundation, and at trial, he shared his perspective on the general expectations of faculty to fund their research and a portion of their own salary. Dr. Strauss succeeded Dr. Boat and similarly testified regarding his understanding of faculty funding expectations at the time he entered his role. In fairness, neither of these individuals ever personally negotiated Dr. Ma's employment contracts. But they spoke to Dr. Ma's repeated failures to obtain external funding to cover his research costs and salary, as noted in his annual evaluations. At the time of Dr. Ma's termination, Dr. White was his supervisor. Dr. White's deposition was read into the record in which he stated that he repeatedly communicated to his faculty that they had to reach certain levels of funding in order to "sustain" their research and that in his experience, such expectations were also in employee offer letters. Dr. White also recounted Dr. Ma's repeated failures in obtaining sufficient funding, even though such expectations were communicated in his annual evaluations over several years. In addition to this testimony and the evaluations, CCHMC relied on the 1992 and 2007 offer letters, which it contended both contained Dr. Ma's obligation to cover a portion of his own salary with external grants.

{¶ 30} Importantly, Dr. Ma did not object to the pertinent testimony of either Dr. Strauss or Dr. Boat. He objected to their ability to testify as to the terms of his contract specifically, but he did not object to their overall ability to speak to the contractual

expectations of faculty when they were supervisors. Dr. Ma filed a motion in limine shortly before the start of trial in an attempt to exclude Dr. White's testimony, arguing that his name was not included on CCHMC's witness list. But Dr. Ma made no objection that the contents of Dr. White's deposition were not relevant (nor does he advance any argument on appeal to exclude that evidence). And while Dr. Ma takes issue with the jury's ability to consider the evaluations, he was actually the first to mention the documents at trial.

{¶ 31} Again, this was an extremely close case, as outlined by the evidence recounted above. Both sides presented evidence that spoke to the main issue at hand. But ultimately this was a question for the jury, and Dr. Ma failed to demonstrate to us that the jury's conclusion was contrary to the greater weight of credible evidence or that he was in any way prejudiced by evidence that he originally brought attention to. He essentially asks us to hold that his evidence was more persuasive. But courts should "always be mindful of the presumption in favor of the finder of fact." *Eastley*, 2012-Ohio-2179, at ¶ 21. Based on its verdict, the jury assigned greater weight to CCHMC's evidence and position, and Dr. Ma has failed to show why we should reject the jury's decision.

{¶ 32} We accordingly overrule Dr. Ma's second assignment of error.

IV.

{¶ 33} In his third assignment of error, Dr. Ma contends that the trial court improperly admitted testimony in the form of CCHMC's repeated references to his Chinese heritage and the Chinese government, which he believes was an attempt to stoke xenophobic fears and biases in the minds of the jury.

{¶ 34} Relevant evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, or confusion of the issues, or of misleading the jury." Evid.R. 403. In deciding whether to admit evidence, the "trial court has broad

14

discretion . . . and, absent an abuse of [that] discretion . . . [the appellate court] will not reverse a trial court's ruling on" the admissibility of a particular piece of evidence. *Hounchell v. Durrani*, 2023-Ohio-2501, ¶ 34 (1st Dist.). An abuse of discretion occurs when the trial court "exercise[s] its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson*, 2021-Ohio-3304, at ¶ 35. Trial courts may not admit evidence or allow parties to make comments "that are not supported by the evidence and are designed to arouse passion or prejudice, creating a substantial likelihood that the jury may be misled." *Bender v. Durrani*, 2024-Ohio-1258, ¶ 68 (1st Dist.), citing *Roetenberger v. Christ Hosp. & Anesthesia Assocs. of Cincinnati*, 2005-Ohio-5205, ¶ 9 (1st Dist.). Such prejudicial evidence "may be grounds for reversal." *Id.*, at ¶ 68, citing *Wynn v. Gilbert*, 2007-Ohio-2798, ¶ 34 (1st Dist.). After reviewing the examples cited by Dr. Ma in the trial transcript, we cannot find that the trial court abused its discretion on these evidentiary decisions.

{¶ 35} After his termination from CCHMC, Dr. Ma began working and researching at Zhejiang University in China with a grant from the Thousand Talents Program ("TTP"), which is awarded by the government of the People's Republic of China and was a prerequisite to signing a contract with the University. During trial, CCHMC mentioned the TTP award's ties with the Chinese government and labeled Dr. Ma's employment with the University as "working for the Chinese government." Dr. Ma alleges that the repeated mention of the Chinese government, despite his corrections that the University was not affiliated with the government, was an attempt by CCHMC to arouse xenophobic fears and biases among the jury.

{¶ 36} Importantly, these comments surfaced during a line of questioning by CCHMC attempting to explore potential mitigation of damages. The handful of references to the Chinese government were asking whether the University was connected to the government,

and if Dr. Ma reflected such a relationship on his tax returns regarding his income. After all, if Dr. Ma found suitable employment immediately after his termination for the same compensation, he might have been unable to establish the damages element of his claim. Even if it were a lesser amount, if, as CCHMC expected, this money came from the Chinese government as a portion of Dr. Ma's income, it would decrease the potential amount of damages. Therefore, this information was certainly relevant as it pertained to damages.

{¶ 37} Additionally, Dr. Ma claims that CCHMC attempted to draw comparisons between himself and a former CCHMC employee, Dr. Lu, another researcher for CCHMC who was fired after CCHMC found that he violated restrictions on external income. Dr. Ma himself prepared a list of comparators for trial in an apparent attempt to demonstrate that other researchers were *not* fired for the same funding shortcomings as Dr. Ma. He actually included Dr. Lu on this list (for reasons that are not immediately apparent) and, in addressing Dr. Ma's argument as to the comparators, CCHMC inquired about the reasons each person was or was not fired for their alleged shortcomings. When it came to Dr. Lu, CCHMC asked about his termination and asked the witness if the TTP award that Dr. Lu improperly received while working at CCHMC was the same one that Dr. Ma later received. Dr. Ma believes that the mention of this sought to conflate his situation with Dr. Lu's improprieties.

{¶ 38} But that seems like a risk Dr. Ma undertook when he drew up the list, added Dr. Lu, and directed the jury's attention to others' situations. CCHMC, not surprisingly, walked through other comparators on the list and discussed their current status, which included an exploration of Dr. Lu's termination. Therefore, while CCHMC did discuss Dr. Lu's involvement with the TTP award and related its source to the discussion of Dr. Ma's acceptance of the award, it responded to Dr. Ma's own argument.

{¶ **39**} Similarly, Dr. Ma claims that CCHMC inappropriately attempted to incite xenophobic fears and biases among the jury when its damages expert, Mr. Klenk, mentioned that, as part of his evaluation of Dr. Ma's financial records, he read articles about other researchers who took money from various foreign governments while working in the United States. Dr. Ma claims that Mr. Klenk's investigation into and testimony about journal articles pertaining to other researchers, coupled with the several mentions of the Chinese government and Dr. Lu, clearly aroused biases among the jury. However, Dr. Ma was the first party to bring attention to these articles at trial. Mr. Klenk explained that part of his investigation into Dr. Ma's potential damages necessitated an inquiry into whether Dr. Ma might have (improperly) earned additional income while still researching at CCHMC. Mr. Klenk emphasized that he did this research in order to "foreclose the possibility" of Dr. Ma's potential to have additional earnings, which was directly related to his evaluation of damages.

{¶ **40**} Although this might seem of tenuous relevance to the case at hand, it was actually Dr. Ma that attempted to push a nefarious narrative on CCHMC and Mr. Klenk regarding these issues. Dr. Ma probed whether Mr. Klenk thought he was a fraud because he took an award from the Chinese government and inquired if that's why Mr. Klenk went down the research path that he did. Dr. Ma brought this issue and this narrative to the forefront. He cannot now say that it was prejudicial to allow such discussions.

{¶ **41**} We obviously would not condone any deliberate effort by either side to promote racial or xenophobic fears in a trial—the courtroom has no place for such antics. But that does not bar any mention of some connection with a foreign government or heritage. The propriety of such will depend on the record at hand and the purpose for which such evidence is offered. After carefully reviewing the passages highlighted by Dr. Ma, we are not convinced that they crossed the line (particularly since he bears at least some responsibility for

introducing the topics in the first place).  At the end of the day, we cannot say that the trial court abused its discretion in the challenged evidentiary rulings, and we overrule Dr. Ma's third assignment of error.

* * *

{¶ 42}  Based on the foregoing reasons, we overrule all three of Dr. Ma's assignments of error.  We affirm the trial court's judgment on all grounds.

Judgment affirmed.

**ZAYAS, P.J.**, and **KINSLEY, J.**, concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.