[Cite as *Fairbanks v. Broker's Alliance of Ohio, Inc.*, 2026-Ohio-2213.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

ERIN FAIRBANKS,

Plaintiff-Appellant,

v.

BROKER'S ALLIANCE OF OHIO, INC. dba DCW GROUP,

Defendant-Appellee.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 25 MA 0095**

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2023 CV 02385

**BEFORE:**
Carol Ann Robb, Mark A. Hanni, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Randy J. Hart*, *Atty. A. Scott Fromson,* for Plaintiff-Appellant and

*Atty. Thomas F. Hull, II*, *Atty. E. Carroll Thornton, Jr.* Manchester Newman & Bennett, LPA, for Defendant-Appellee.

Dated: June 11, 2026

**Robb, J.**

{¶1} Plaintiff-Appellant Erin Fairbanks appeals the decision of the Mahoning County Common Pleas Court granting summary judgment to Defendant-Appellee Broker's Alliance of Ohio, Inc. dba DCW Group. Appellant contends the court erred in finding there existed no genuine issue of material fact on her claims for breach of contract, promissory estoppel, and unjust enrichment. For the following reasons, the trial court's judgment is affirmed.

## STATEMENT OF THE CASE

{¶2} Appellee is an insurance benefits consultant and broker selling major medical insurance, non-major medical insurance (dental, life, vision, and disability), and Medicare products in addition to administering some of these employee benefits for its clients. It is a private corporation with two owners, Robert Gearhart Sr. (R.G. Sr.) and Robert Gearhart Jr. (R.G. Jr.).

{¶3} In a letter agreement dated November 7, 2017, Appellee extended a written job offer to Appellant for the position of account manager. The agreement said she would be required to maintain her life, accident, and health insurance license issued by the State of Ohio with Appellee purchasing her errors and omissions insurance. As additional job benefits, Appellee would pay 100% of Appellant's health insurance premiums (subject to change after 2018) and grant her seven vacation days and eight holidays.

{¶4} The following payment clause explained the right to account-based pay applying a fixed percentage of revenue managed but with the assurance of a minimum annual base salary that would be higher than the alternative figure due to the low revenue she would be assigned to manage:

> Your annual salary will be $42,800. Each year your base salary will be equal to ten percent (10%) of the revenue you are managing. On your date of hire, the amount of revenue you will be managing will be less than $428,000 but your base salary for this position will not go below $42,800.

(S.J. Ex. B-2). The agreement was signed by R.G. Jr. on behalf of Appellee on November 6, 2017 and thereafter signed by Appellant.

Case No. 25 MA 0095

**{¶5}**   Appellant also received a written description of the account manager position, which explained the position had no supervisory responsibilities and reported to R.G. Sr. and R.G. Jr.  Before providing a list of functions, the job description's summary of the objective included the following statement:  "The person in this position will be the primary *service contact for an assigned book of business* and develop a strong working relationship with both the clients and carriers."  (Emphasis added.)  (S.J. Ex. B-1); (S.J. Opp. Ex. 2).

**{¶6}**   The education and experience portion of the job description described various qualifications including, "Required insurance licenses or ability to obtain within 90 days."  Lastly, the document concluded:  "Other Duties:  Please note this job description is not designed to cover or contain a comprehensive listing of activities, duties or responsibilities that are required of the employee for this job.  Duties, responsibilities and activities may change at any time with or without notice." *Id.*

**{¶7}**   Appellant began working for Appellee on December 4, 2017.   She apparently left a long-time position as an employee benefits specialist for this new job. (Pl. Aff.); (Pl. 2022 Dep. 15-16, 27).   After approximately three months, Appellant complained about her high deductible for health insurance and her low vacation allocation while asserting her former employer wanted her to return.  As a result, Appellee agreed to contribute $6,000 to Appellant's 2018 health savings account and to give her an extra eight vacation days. (R.G. Sr. Aff.); (Pl. 2022 Dep. 27-28).  Appellant signed a March 19, 2018 letter agreement memorializing the new benefits.  (S.J. Ex. B-3).

**{¶8}**   After a year of employment, Appellant asked for and received a raise.  (R.G. Sr. Aff.).  The resulting January 30, 2019 letter agreement she signed memorialized the following additions:  a "3% increase in your base salary beginning with the February 1, 2019 payroll" (which increased her annual salary from $42,800 to $44,084); a $5,000 bonus in April, after Appellee received the prior year firm bonuses; and another $6,000 contribution to Appellant's health savings account.  (S.J. Ex. B-5); (S.J. Opp. Ex. 5).  At deposition, she conceded receiving all of these payments and benefits, and she acknowledged all promises were in writing.   (Pl. 2022 Dep. 30, 34).

**{¶9}**   On January 5, 2021, after three years of working for Appellee, Appellant was terminated due to a series of mistakes.  (R.G. Sr. Aff.); (S.J. Ex. B-6).  A few months

later, she filed suit against Appellee but dismissed that action in February 2023. She refiled the lawsuit on December 1, 2023, resulting in the case at issue.

{¶10} Appellant's complaint set forth claims for breach of contract, promissory estoppel, and unjust enrichment. All three claims revolved around her allegation that Appellee failed to pay the promised compensation. (A claim for fraud in the inducement was not maintained in opposition to summary judgment or on appeal.) The complaint alleged, "From the beginning of her employment with DCW, through December 2020, Ms. Fairbanks was the only account manager. Thus, for that time, all insurance written by DCW was managed by Ms. Fairbanks." The complaint theorized Appellee's total revenue was $428,000 when Appellant was hired, and this is why she was paid $42,800. It was then claimed the amount of revenue she managed grew to over $25 million, entitling her to over $2.5 million.

{¶11} In moving for summary judgment, Appellee explained the figure of $25 million used in Appellant's complaint appeared to be based on the amount Appellee's *clients paid directly to their insurance carriers.* Appellee's actual revenue, derived from major medical products, was received from the insurers as a flat-rate commission based on each member enrolled in a client's employer-offered benefit plan. (Aff. R.G. Sr.).

{¶12} Appellee's motion explained Appellant's counsel eventually realized this particular error but still claimed Appellant was entitled to her percentage of Appellee's *total annual revenue* regardless of whether it was derived from her assigned book of business. Appellee urged this demand for a percentage of the total revenue, even if it was derived from clients outside of the book of business assigned to Appellant, contravened the plain terms of the employment agreement. It was pointed out the book of business assigned to Appellant included only certain clients and only major medical insurance products (not vision, dental, disability, life, or Medicare).

{¶13} Appellee's summary judgment motion observed the following points: the company had multiple account managers who were not legally required to have a license because they did not sell, solicit, or negotiate insurance; Appellant was granted a higher starting base salary in recognition that she held a license; Appellant was initially assigned a book of business representing only approximately 52% of Appellee's major medical insurance revenue; she was not to deal with non-major medical insurance matters for

those clients (which were handled by an independent contractor); other account managers were assigned to manage other major medical clients; certain other products were handled by independent contractors; some clients were not assigned to an account manager (if the client only had two employees or were serviced by the owners due to their high profile or personal relationship); and Appellee had multiple revenue streams in which Appellant played no part.

{¶14}  Appellee pointed out Appellant utilized the company software showing the account manager assigned to each client and listing the revenue generated by the client. (R.G. Jr. Aff.); (Pl. 2025 Dep. 10-13).  In fact, during her employment, Appellant generated a list of her *assigned* clients, which included her prior assignment of accounts plus an additional allocation of clients (adding approximately $41,000 in revenue to her assigned book of business).  (R.G. Jr. Aff., Ex. B-7); (Pl. 2025 Dep. 17-19, Ex. 9-10).

{¶15}  According to Appellee's records, the major medical revenue from the clients assigned to Appellant was $288,528.43 in 2018 (beginning at 52% of their major medical revenue), $399,607.27 in 2019, and $353,304.42 in 2020 (rising to 74% of their major medical revenue).  (R.G. Jr. Aff).  It was concluded the salary she received stayed above the amount she would have been paid under the account-based percentage of revenue formula and thus there was no evidence of failure to pay all money owed to Appellant.

{¶16}  Appellee pointed out this analysis was dispositive of all causes of action, as they all hinged on the same allegations of improper compensation.  It was also noted promissory estoppel is used when there is no contract, and unjust enrichment is not applicable when there is a contract on the same subject absent bad faith, fraud, or illegality.

{¶17}  Exhibit A to Appellee's summary judgment motion was the affidavit of R.G. Sr.  He relayed facts about the business, the job offer, and Appellant's requests for raises. He also incorporated a one-page summary of the company's total commissions from each product type and from consulting.  (Ex. A-1).

{¶18}  Exhibit B was the affidavit of R.G. Jr. attesting to other facts and figures in Appellee's motion while incorporating the agreements and other items.  For instance, he authenticated an annual review Appellant completed on January 28, 2019 evaluating her own performance.  Therein, she agreed she was below expectations in "[u]nderstand[ing]

how the job is related to the work of other employees and the company" (and sometimes below expectations for care and attention to detail while noting she needed to slow down). (Ex. B-4). R.G. Jr. also provided emails containing an example of her subsequent lack of care and attention to detail along with a complaint about her forwarding emails for others to perform tasks without reading the emails. (Ex. B-6).

{¶19} Appellee also attached Appellant's 2022 and 2025 depositions. The exhibits to the latter deposition included emails wherein Appellant: attached a list she generated of only the clients officially assigned to her by Appellee (after an additional allotment was assigned to her); told one client she will forward an inquiry to R.G. Sr. since Medicare was his "wheelhouse" and she did not deal with those products; forwarded a client's email to someone while stating she had "no clue" because the client was serviced by R.G. Jr. who was at a seminar for the week; and informed a client Appellee's staff happily covered for each other when one is off work (while disclosing Appellant had an additional job benefit of working from home). (S.J. Ex. D-10, D-11, D-12, D-14).

{¶20} Despite these facts and her testimonial acknowledgement of similar examples, including a different client who was wholly serviced by an independent contractor, Appellant opined if the firm received payment, she was entitled to a percentage of it. (Pl. 2025 Dep. 22-23). Appellant's testimony additionally acknowledged she did not sell insurance and explained: "My job duties were customer service. My duties were speaking to usually HR of any clients, or employees, should they call, about claims issues, billing issues, enrollment issues, any type of issues they have pertaining to their insurance plans." (Pl. 2022 Dep. 37, 40) (also noting the business grew quickly because the owners were great salesmen).

{¶21} At deposition, she also differentiated the various lines of insurance the owners sold, providing examples such as, "Health, life, vision, dental, short-term, long-term." *Id.* at 37-38. She was asked, "Now, of all those different lines of insurance, your responsibility was for medical; correct?" Appellant answered, "Correct." When asked what "medical" meant, she replied, "Their health care, their major medical plan." *Id.* at 38. She thereby further confirmed the affidavit of R.G. Jr. on her limited product assignment.

{¶22} Appellant's opposition to summary judgment said she quit her job to work for Appellee in reliance on the promise to pay her 10% of the revenue she was managing. It was asserted her pay at her former job "was significantly higher than the $42,800 contained in the agreement" without citing summary judgment evidence on this assertion. (S.J. Opp. 3). As to her claimed belief about the scope of the revenue she would be managing, her opposition relied on a conclusion that account managers would be required by the state to be licensed, citing an insurance statute and interpreting it as disallowing an unlicensed person from *conferring in any way* with even an existing client with regard to their insurance.

{¶23} She then claimed she was the only licensed account manager (while dismissing the significance of the undisputed fact that the two owners were licensed insurance agents). Her opposition concluded: "This meant that Ms. Fairbanks would be managing the entire book of business for DCW and would not be sharing any portion of that with any other person." (S.J. Opp. 3). Likewise, her affidavit in support of her opposition reiterated, "As the sole licensed person at DCW with the job title of Account Manager during those times, Ms. Fairbanks serviced each of the accounts which generated that income." (Pl. Aff.). She also attached a list of Appellee's various clients claiming she conferred with each one. From this, her opposition thus concluded all of Appellee's clients constituted "the revenue you are managing" as the phrase was used in the employment agreement.

{¶24} Appellant's opposition to summary judgment then asserted her percentage should be derived from line one of the corporate income tax returns.[1] Her opposition attached the first page of Appellee's 2018, 2019, and 2020 tax returns (without incorporating them as summary judgment evidence). Additionally, although her complaint said the causes of action revolved around her claim to entitlement to 10% (of all revenue) and although Appellee's answer set forth as an affirmative defense that Appellant failed to attach the written amendment to the agreement to her complaint as required by Civ.R. 10(D)(1), Appellant's opposition to summary judgment declared the written amendment granting her a 3% increase in her base salary also changed her account-based pay

---

[1] Line one on the tax return is gross receipts or sales before the deductions in lines 7 through 20, such as compensation paid to officers and employees, including Appellant's base salary.

percentage. From this, she claimed the raise entitled her to 13% of the revenue she managed in 2020 (apparently by assuming if 10 plus 3 is 13, then a 3% increase to 10% must be 13%).

**{¶25}** Based upon these contentions, she claimed contractual entitlement to the following salary: $79,821 in 2018 (10% of $798,218 from line one of Appellee's tax return); $108,694 in 2019 (10% of $1,086,944 from line one of the tax return); and $150,155 in 2020 (13% of $1,155,011 from line one of the tax return). (S.J. Opp. 5, 9, Ex. 4).

**{¶26}** In reviewing her specific claims, Appellant pointed out her breach of contract claim was based on a written contract, not an oral or implied contract. She acknowledged the promissory estoppel claim was based on her reliance on the written contract when she quit her prior job and her failure to be paid 10% of Appellee's total revenue. She said the promissory estoppel claim was presented in the alternative to her contract claim (while recognizing an unambiguous written contract cannot be altered by an oral agreement and recognizing if the court found a valid written unambiguous contract, then her promissory estoppel claim would have no merit).

**{¶27}** As to her "alternative" unjust enrichment claim, she said it could not be considered inconsistent with the contract claim until the court determined the contract was enforceable (even though no one was arguing the contract was unenforceable). She also said a party to a contract may proceed on an unjust enrichment claim on the same matter covered by a contract under certain circumstances, including if bad faith was alleged. She then claimed she showed bad faith because Appellee was defending against her lawsuit by claiming compliance with the contract even though R.G. Jr. once allegedly said he could not "honor" an inquiry she made about making more in reference to the 10% figure. (Pl. Aff); (Pl. Dep. 31-32). Her opposition also attached a portion of an owner's deposition and claimed it supported her interpretation of the contract. (R.G. Sr. Dep. 50).

**{¶28}** In reply further supporting the summary judgment motion, Appellee said Appellant was drawing attention to irrelevant facts or citing only select portions of encounters. It was pointed out each claim revolved around the same assertion that Appellant was paid less than what was promised in the written agreement. It was

emphasized that Appellant admitted there were three account managers in addition to herself and two of the other account managers were assigned medical clients as well. (Pl. 2022 Dep. 39). It was pointed out Appellant did not dispute they would cover for each other when one was off sick or on vacation and did not establish a client's assignment status would change every time one account manager answered a phone call from a client that was not assigned to them (R.G. Jr. Dep. 98-99).

**{¶29}** The claim in the complaint that Appellant took the job because she was the only account manager with an insurance license was shown to be false because another account manager was licensed at the time. (S.J. Ex. E). Appellant's own testimony essentially admitted another account manager had a license at the time of Appellant's hire: "By October 2018, I was their only licensed account manager." (Pl. 2022 Dep. 40).

**{¶30}** Appellee additionally urged this case was not about insurance law and the contract was not altered by the answer to whether other account managers have or should have licenses to merely service existing customers. In any event, Appellee concluded the law does not require these account managers to be licensed because they do not sell, solicit, or negotiate insurance products. (R.G. Jr. Aff.). Emphasis was placed on Appellant's acknowledgement that the two owners had licenses and worked with various clients. In the few pages of R.G. Sr.'s deposition that *Appellant attached* to her opposition, this owner explained his responsibilities included new business prospecting *and servicing the existing book of business*. (R.G. Sr. Dep. 9).

**{¶31}** In addition, Appellee's reply reiterated how the cited revenue on line one of the tax return accounted for multiple products and consulting services but Appellant was only assigned to some clients and only to their major medical matters. Appellee said Appellant's position ignored the language of the initial employment agreement granting her an annual salary of $42,800 while expressly stating although the base salary will be "equal to 10% of the revenue you are managing" and although "the amount of revenue you will be managing will be less than $428,000," the base will not go below the minimum base of $42,800. Appellee said Appellant also ignored the amendment (increasing the base salary she was actually receiving) and the job description she received with the agreement (which explained she would be "assigned" a book of business).

Case No. 25 MA 0095

{¶32} As to the 13% argument Appellant applied to 2020, Appellee pointed out the raise was specified to be a 3% increase in the base salary she was receiving with no mention of her accounts or revenue managed (or percentage points) and Appellant was paid amounts constituting a 3% raise to the initial $42,800 base salary, which payments she accepted. It was pointed out because Appellant never earned more than her minimum base salary through the account-based pay formula, an increase to the 10% figure in response to her request for a raise would have been pointless. Regardless, Appellee emphasized that even assuming the 3% increase applied to her pay formula percentage, mathematically, this would only entitle her to 10.3% of the revenue she managed, not 13%. It was then pointed out she made well over 10% of the revenue derived from her assigned book of business.

{¶33} On October 2, 2025, the trial court granted summary judgment to Appellee. The court pointed out Appellant acknowledged: she was "assigned" accounts that were her responsibility for managing; she managed only major medical products, which generated only a portion of Appellee's income; and she was one of multiple employees that were assigned major medical clients. The court concluded the evidence would not allow reasonable minds to find she was entitled to a percentage of revenue generated by clients or products she was not assigned to manage. It was pointed out Appellee paid Appellant a salary higher than her contractual percentage of the revenue she was assigned during the three years at issue.

{¶34} The court therefore concluded there was no breach of the enforceable contract and thus Appellee was entitled to summary judgment on Appellant's breach of contract claim. It was observed, "Central to each of Plaintiff's claims is Plaintiff's assertion that she was not compensated by DCW as agreed." The court then said the promissory estoppel theory of liability only arises when the contract requisites are not met and a promise needs to be enforced to avoid injustice, but here, the requisites for a contract were met. In any event, the court observed Appellee fulfilled its promises to Appellant and she was not injured by reliance on those promises.

{¶35} As to her unjust enrichment claim, the court ruled the claim failed because there was an enforceable contract with no evidence of bad faith, fraud, or other illegality. The court additionally concluded her unjust enrichment claim could not survive because

she was not denied compensation, citing a case setting forth the elements of unjust enrichment. On the fraudulent inducement claim, the court said there was no evidence of a misrepresentation so as to induce the agreement and regardless no evidence of intent in inducing the agreement at the time. As noted above, this claim was not maintained in opposition to summary judgment or on appeal.

{¶36} Appellant filed a timely notice of appeal. She contests the entry of summary judgment and sets forth three assignments of error, first addressing the breach of contract claim and then addressing the alternative claims of promissory estoppel and unjust enrichment.

## SUMMARY JUDGMENT

{¶37} Pursuant to Civ.R. 56(C), summary judgment shall be granted when the evidence shows there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Summary judgment is appropriate if reasonable minds can only find in favor of movant after viewing the evidence in the light most favorable to the non-movant. Civ.R. 56(C).

{¶38} The summary judgment movant has the initial burden of stating why the movant is entitled to judgment as a matter of law and showing there is no genuine issue of material fact. *Byrd v. Smith*, 2006-Ohio-3455, ¶ 10, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292-294 (1996). The non-movant then has a reciprocal burden. *Id.* The non-movant's response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing there is a genuine issue of material fact for trial and may not rest upon mere allegations or denials in the pleadings. Civ.R. 56(E).

{¶39} The material issues of each case depend on the governing law, and only outcome-determinative and properly disputed facts will preclude summary judgment. *Byrd* at ¶ 12. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In accordance, if a particular disputed fact is not dispositive because of the lack of a genuine issue on a threshold legal matter, then summary judgment is still appropriate. *Anderson v. Fleagane*, 2022-Ohio-1120, ¶ 26 (7th Dist.).

Case No. 25 MA 0095

**{¶40}** "A party cannot create a genuine issue of material fact by ignoring or contradicting their own deposition testimony." *U.S. Bank, N.A. v. Petrarca*, 2026-Ohio-293, ¶ 34 (7th Dist.), citing *Byrd* at ¶ 28 (a party's affidavit that contradicts their deposition testimony does not create a genuine issue of material fact where it is more than a supplementation and contains no explanation of the confusion) and *Isaac v. Alabanza Corp.*, 2007-Ohio-1396, ¶ 41 (7th Dist.) (self-contradictory statements by the plaintiff in a deposition cannot be used to overcome defendant's motion for summary judgment).

**{¶41}** The granting of summary judgment is assessed under a de novo standard of review. *Bohlen v. Anadarko E & P Onshore, L.L.C.*, 2017-Ohio-4025, ¶ 10. We therefore apply the same standard as the trial court.

ASSIGNMENT OF ERROR ONE

**{¶42}** Appellant sets forth three assignments of error, the first of which contends:

"THE TRIAL COURT ERRED IN HOLDING THAT THERE IS NO ISSUE OF FACT REGARDING MS. FAIRBANK'S BREACH OF CONTRACT CLAIM."

**{¶43}** At various points, Appellant says there remains a genuine issue as to whether the written agreements were valid and enforceable contracts. She cites the elements for an enforceable contract (offer, acceptance, and consideration). However, the existence of a valid and enforceable contract is not in dispute. Appellant is conflating the concept of enforceability with the dispute over whether there was a breach of the contractual terms.

**{¶44}** As stated in the case cited by the trial court: "The elements of a breach of contract claim are the existence of a contract, performance by the plaintiff, breach by the defendant, and resulting damage to the plaintiff . . . The construction of a written contract is a matter of law." *V.T. Larney, Ltd. v. Locust St. Invest. Co., LP*, 2019-Ohio-496, ¶ 25 (7th Dist.). Appellant's opposition to summary judgment specified her breach of contract claim was based on a written contract, not an oral or implied contract. Her reply brief on appeal also acknowledges her arguments about her insurance license were not asserting an implied contract.

**{¶45}** In evaluating the contractual requirements, the unambiguous language of the contract governs, and a party is not entitled to assign a construction to contract terms at odds with what the plain language of the contract provides. *Id.* at ¶ 15; *see also Tera,*

*L.L.C. v. Rice Drilling D, L.L.C.*, 2024-Ohio-1945, ¶ 12, 18-19 (the question of whether a contract is ambiguous is a question of law). The parties agree the contract language is clear and unambiguous.

**{¶46}** As reviewed in our Statement of the Case above, which we incorporate here as well, Appellant claims entitlement to her contractual percentage from all of Appellee's revenue based on her interpretation of the agreements, including the job description, in combination with her status as a licensed account manager and her contention that she performed some task on nearly every client. The contract plainly stated Appellant would be granted a minimum salary of $42,800 while specifically pointing out she would receive this minimum salary even though the amount of revenue she would be managing was less than $428,000 in revenue and the alternative base rate was 10% of the revenue she would manage. The job description she relies on explicitly explained she would "service . . . an assigned book of business." It also said she had no supervisory responsibilities and her duties could change.

**{¶47}** Appellant received her minimum base salary when she started. The contract itself said she would *not* be managing enough revenue to utilize the 10% figure. Appellee provided evidence of the managed revenue figures related to Appellant's assigned book of business. Appellee also showed Appellant continued to receive a salary above her contractual alternative percentage as applied to her assigned book of business. Appellant did not dispute Appellee placed a label on only certain clients and on only certain businesses from the client in order to show what clients were assigned to Appellant as the account manager for those clients. Rather, Appellant argued she necessarily managed the entire business because she was the only account manager with a license and/or she spoke to nearly every client at some point.

**{¶48}** Contrary to the statement in her complaint that she was the only account manager and thus all insurance written by Appellee was managed by Appellant, her own testimony admitted there were three other account managers and two of them handled medical clients as she did. (Pl. 2022 Dep. 39). Furthermore, contrary to the blanket statement made by her attorney in various other filings, Appellant's deposition testimony acknowledged another account manager had a license when Appellant accepted the position and for some time thereafter. *Id.* at 40. Plus, she agreed both owners were

licensed by the state. She also spoke of them as being great insurance salesmen and did not factually dispute that they (not her) sold the insurance and they also managed some clients or particular products. She also admitted Appellee made revenue from various lines of insurance, but she was only responsible for major medical. *Id.* at 37-38. "A party cannot create a genuine issue of material fact by ignoring or contradicting their own deposition testimony." *Petrarca*, 2026-Ohio-293, at ¶ 34 (7th Dist.), citing *Byrd*, 2006-Ohio-3455, at ¶ 28.

**{¶49}** Moreover, her proposed interpretation of the statutory law as requiring any employee to be licensed in order to speak to an existing client does not change the language of parties' agreements or the undisputed material facts. In addition, Appellee provided evidence that account managers did not sell, solicit, or negotiate insurance. Appellant disputed this statement only through her legal contention that "negotiate" statutorily includes conferring in any manner with an existing client.

**{¶50}** In arguing other account managers were legally prohibited from servicing the accounts of existing clients, she cites insurance statutes stating an unlicensed person shall not sell, solicit, or negotiate insurance in this state and defining a license. R.C. 3905.02; R.C. 3905.01(H). She then relies on the following statutory definition of the word negotiate: "confer directly with, or offer advice directly to, a purchaser or prospective purchaser of a particular contract of insurance with respect to the substantive benefits, terms, or conditions of the contract, provided the person that is conferring or offering advice either sells insurance or obtains insurance from insurers for purchasers." R.C. 3905.01(O). She interprets this as disallowing an unlicensed person from *conferring in any way* with an existing client on a manner related to their insurance because the client is a person who has purchased and may again purchase insurance from Appellee.

**{¶51}** However, the final "provided" clause shows the definition refers to the direct conferring by the person who "sells" or "obtains" insurance, not administrative representatives thereafter providing customer service to clients. Appellant did not say she, as an account manager, "sells insurance or obtains insurance from insurers for purchasers." R.C. 3905.01(O). R.C. 3905.01(Q) (defining sell as "to exchange a contract of insurance by any means, for money or its equivalent, on behalf of an insurer"). For instance, a client who calls to add an employee to their plan or ask about the procedures

Case No. 25 MA 0095

of the existing policy is not being negotiated insurance by the person who answers the phone.

**{¶52}** Moreover, her argument fails to address the exceptions to the cited license requirement. *See, e.g.,* R.C. 3905.03(A)(2) (insurance agent's employee who does not receive commissions on the policies written or sold and the employee's activities are executive, administrative, managerial, clerical, or any combination thereof, and are only indirectly related to the sale, solicitation, or negotiation of insurance or the employee's function relates to processing, adjusting, investigation, or settling of a claim on a contract of insurance, among other items), (A)(9) (insurance agent's employee who, at the direction of the agent, performs any of the following: accepts premiums other than the initial premium, gathers information, sets appointments without communicating insurance information, services existing insurance policies issued by or through her employer if not part of a solicitation, or performs clerical or ministerial duties).

**{¶53}** In any event, claiming to be the only account manager with an insurance license does not mean there is a genuine issue of material fact as to whether she should be considered to have managed the entire caseload of the business run by two licensed agents. No reasonable person could conclude the agreement's reference to 10% of the revenue Appellant will be managing referred to all of Appellee's revenue, regardless of whether the client was assigned to Appellant by Appellee, regardless of whether the revenue category was assigned to her, regardless of whether the client or product was assigned to another account manager or unassigned to anyone in the system due to small size or due to the owners handling high profile or personal clients, and regardless of the fact that employees cover for each other during days off.

**{¶54}** Appellant also argues she established a genuine issue of material fact by claiming R.G. Jr. essentially admitted her interpretation of the contract by allegedly replying to her inquiry by voicing, "Oh, I meant to talk to you about that . . . however, I can't honor that at this time." At deposition, Appellant vaguely said this alleged statement was in response to a general inquiry, "I asked about the 10%". (Pl. 2022 Dep. 31-32). She also said it occurred in June or July of 2018. This would have been two to three months after she asked for and received an increase to her benefits and just prior to *her personally making a list of her officially assigned clients* (after being transferred a set of

accounts from the other licensed account manager).  This was six or seven months into her employment, and the next time she asked for a raise, she received it despite her assigned book not increasing enough for the base to increase to the account-based pay rate.

**{¶55}** R.G. Jr.'s affidavit replied by saying Appellant never came to him with concerns that she was not being properly compensated and he only learned of her allegations after she filed the lawsuit.  (R.G. Sr.'s affidavit said the same and notes she voiced an opposite concern about losing her minimum base.)

**{¶56}** Appellant then submitted her affidavit claiming the statement she attributed to R.G. Jr. was made after her inquiry "as to why I had not received amounts promised in the employment agreement."  Her affidavit also changed the date of this conversation to 2019 without explaining why her deposition specified June or July of 2018.

**{¶57}** As is well established by the Ohio Supreme Court, not every disputed fact is material.  *Byrd*, 2006-Ohio-3455, at ¶ 12, 28 (and a party's affidavit contradicting their own deposition testimony does not create a genuine issue of material fact where it is more than a mere supplementation and does not contain sufficient explanation about the confusion).  A party does not necessarily create a genuine issue of material fact by merely disputing a statement of the other party, such as by claiming someone once acknowledged their contract interpretation but refused to comply.  *See id.; Liberty Lobby*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."); *Fleagane*, 2022-Ohio-1120, at ¶ 26 (7th Dist.) (if a particular disputed fact is not dispositive because of the lack of a genuine issue on a threshold legal matter, then summary judgment is still appropriate).

**{¶58}** There is a distinct difference between an employer's statement that they cannot honor a request or demand made by an employee versus a statement admitting a promise was made in a contract but they cannot honor their own promise.  Appellant did not show she expressed anything more to R.G. Jr. than her theory of this case:  that she wanted credit for all accounts due to her license regardless of whether they were in the book of business assigned to her (if her statement could even be read as expressing

that much). In any case, her claim is based on the written agreement and her rights and reliance thereon, not on after-the-fact request denials.

**{¶59}** Furthermore, Appellant's brief relies on the same misrepresentation contained in her summary judgment opposition where it was claimed R.G. Sr. "admitted that Ms. Fairbanks was not being paid *as required* in the employment contract." (Emphasis added.) (S.J. Opp. 5) (attaching a few pages of his deposition). She quoted the following question and answer: "after March of 2018 did she receive 10 percent of the revenue she was managing? . . . No." (R.G. Sr. Dep. 50). On appeal, she claims the trial court ignored her citation to this sentence, and she insists this constituted evidence to support her claim.

**{¶60}** However, as Appellee's reply in support of summary judgment pointed out to the trial court, the statement at page 5 of Appellant's opposition constituted a false representation of R.G. Sr.'s testimony. First, on the same four-page layout of testimony Appellant attached to her opposition, R.G. Sr. noted he did not perform specific calculations in preparation for his deposition, but he indicated the figure Appellant would have received under the contract percentage would have been lower than what she was actually paid as a base salary. Additionally, he pointed out Appellant came to his office in January 2019 worried about her salary because her book of business was still under $428,000. *Id.* at 49. Most notably, on the same deposition page relied on by Appellant (showing R.G. Sr. answered "No" when asked if Appellant received 10% of the revenue she was managing), he specifically followed this answer by emphasizing: "*She received more money than 10 percent of her book of business*." (Emphasis added.) *Id.* at 50. Accordingly, Appellant's argument that this owner admitted she received less than contractually required is disingenuous.

**{¶61}** Lastly, although she does not specify alternative arguments of being entitled to additional amounts under Appellee's reading of the contract's plain language, we make an observation on her appellate brief merely restating the demand from her opposition to summary judgment about the 3% raise eventually entitling her to 13% of the revenue in 2020. In Appellee's reply to her contention below, it was argued the written grant of a 3% increase in the base salary she was receiving was clearly an increase of the $42,800 minimum base salary she was being paid, not an increase to the alternative calculation

on the percentage applied to the revenue she was managing. It was also pointed out that since Appellant never earned more than her minimum base salary through the account-based pay formula, increasing the 10% figure in response to her request for a raise would have been pointless. On appeal, Appellant does not take the opportunity to analyze any of the arguments against her opposition's demand for 13% (of total revenues) in 2020.

**{¶62}** As Appellee explained below, even assuming the 3% increase applied to Appellant's account-based pay formula percentage, this would have only mathematically entitled her to 10.3% of the revenue she managed, not 13%. Her claimed 13% figure would actually be a 30% relative increase. The written increase was expressed as a percent of a figure, not as a percentage point increase.[2] As further concluded by Appellee below, Appellant was paid well over 10.3% of the revenue derived from her assigned book of business (while noting the payments in 2020 ended up being approximately 13% of her book of business anyway).

**{¶63}** For the foregoing reasons, Appellant's arguments on her breach of contract claim are without merit, and this assignment of error is overruled.

<u>ASSIGNMENT OF ERROR TW0</u>

**{¶64}** Appellant's second assignment of error provides:

"THE TRIAL COURT ERRED IN FINDING AT THE SUMMARY JUDGMENT STAGE, THE PROMISSORY ESTOPPEL CLAIM COULD NOT BE MADE."

**{¶65}** Promissory estoppel is a quasi-contractual, equitable doctrine used to prevent injustice where a promisee is harmed from reasonably and detrimentally relying on the promisor's promise. *Estate of Gregory v. QDP Wholesale Auto, LLC*, 2025-Ohio-1979, ¶ 49 (7th Dist.), citing, *Karnes v. Doctors Hosp.*, 51 Ohio St.3d 139, 142 (1990). A promissory estoppel claim has the following elements: a clear and unambiguous promise; reasonable and foreseeable reliance by the promisee; and injury to the promisee caused by the reliance. *Id.*

---

[2] *See, e.g.*, Mavron & Phillips, *Elements of Mathematics for Economics and Finance*, 11 (2007) ("If a quantity is increased by a percentage, then that percentage of the quantity is added to the original"); AP Stylebook, https://x.com/APStylebook/status/1357775085063528448 (posted February 5, 2021) ("Be careful not to confuse percent with percentage point. A change from 10% to 13% is a rise of 3 percentage points. This is not equal to a 3% change; rather, it's a 30% increase."); Omni Calculator, https://www.omnicalculator.com/math/percentage-of-percentage.

**{¶66}** Because promissory estoppel is inconsistent with an express contract, the existence of an enforceable express contract between the parties bars recovery under the claim of promissory estoppel. *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 440 (1996) (promissory estoppel cannot be used to alter an unambiguous written contract with parol evidence of an oral promise on the same subject matter); *QDP* at ¶ 49-50 ("the agreement between the parties is contractual in nature and precludes any claim for promissory estoppel"); *Seaman v. Fannie Mae*, 2009-Ohio-4030, ¶ 13 (8th Dist.) (noting a promissory estoppel theory could be pursued where the statute of frauds barred the breach of contract claim but then finding statements prior to execution of a purchase agreement were made in anticipation of being bound by only a written contract).

**{¶67}** In the paragraph of the judgment entry disposing of the promissory estoppel claim, the trial court pointed out promissory estoppel only arises when the requisites of a contract were not met and a promise needs to be enforced to avoid injustice. (10/2/25 J.E. ¶ 8), citing *Ma v. Cincinnati Children's Hosp. Med. Ctr.*, 2020-Ohio-1471, ¶ 31 (1st Dist.) ("promissory estoppel is unavailable as a remedy where a valid and enforceable contract governs the relationship"). The trial court concluded the requisites of a contract were met and thus Appellee was entitled to summary judgment on Appellant's promissory estoppel claim. And, the court observed even assuming arguendo the requisites for a contract were not met, Appellee was entitled to summary judgment on promissory estoppel because Appellee fulfilled its promises and Appellant was not injured in reliance thereon.

**{¶68}** In pointing to the promise at issue, Appellant's brief cites to the written job offer signed by both parties and the written 3% increase to her base salary she signed after it was provided to her in writing by Appellee. She says her reliance in leaving her prior employment was reasonable and was detrimental due to the "shortfall" in her salary. As noted above, the opposition to summary judgment alleged Appellant made more at her prior job but cited no evidence in support.

**{¶69}** On the other elements, Appellant wholly relies on and incorporates by reference the arguments from the prior assignment of error in concluding she showed Appellee did not fulfill its promise to her. Consequently, if the threshold argument in the

prior section did not establish a genuine issue of material fact on the failure to fulfill the promise, then this assignment of error would also fail.

{¶70} In the event her threshold argument had merit, she raises another allegation regarding the trial court's holding. She construes the aforementioned paragraph of the judgment disposing of her promissory estoppel claim as containing an alternative holding that a contract claim and a promissory estoppel claim cannot co-exist in a complaint. She then argues they can both be maintained where presented in the alternative.

{¶71} Initially, we note she relies on a quote claiming to be from an Ohio Supreme Court case, "while the court allows promissory estoppel to be alternatively argued to breach of contract claims . . . the oral agreement on which the promissory estoppel claim is based cannot be used to alter the unambiguous written contract"; she relies on the first portion of the quote to show the claims can be alternatively argued. We must point out this quote is not found in the cited Supreme Court case. *Ed Schory & Sons*, 75 Ohio St.3d at 441 (affirming summary judgment on the breach of contract claim because the term alleged was not in the written contract, which contained statute of frauds subjects, and affirming summary judgment on the promissory estoppel claim because the claimed oral promise covered the same subject matter as the written agreements).

{¶72} Next, we recognized claims can be set forth in the alternative pursuant to rule: "A party may set forth two or more statements of a claim . . . alternately or hypothetically, either in one count or . . . in separate counts . . . A party may also state as many separate claims . . . as he has regardless of consistency and whether based on legal or equitable grounds." Civ.R. 8(E)(2). Contrary to the implications of Appellant's argument here, the trial court did not say a plaintiff cannot bring alternative claims in a complaint. Appellant seemingly mixes the analysis of whether there was a valid contract with the distinct analysis of whether the valid contract said what she claims. As explained in the prior section, the validity of a contract is not the equivalent to the validity of a plaintiff's argument about the meaning of a contract. During the summary judgment proceedings, there was no dispute a valid contract existed.

{¶73} Although alternative pleading is permitted under Civ.R. 8(E)(2), this does not counteract the substantive law that promissory estoppel is not consistent with an enforceable written contract and thus recovery under an alternate promissory estoppel

claim is prohibited where the contract on the same promise was enforceable. *QDP*, 2025-Ohio-1979, at ¶ 48-52 (7th Dist.); *see also Gurary v. John Carroll Univ.*, 2024-Ohio-3114, ¶ 42 (8th Dist.) ("an express, written contract existed between [the plaintiff] and [the defendant] covering the matters at issue. Therefore, [the plaintiff] could not prevail on his promissory estoppel claim, and the trial court properly granted summary judgment in favor of JCU on that claim."); *Prime Investments, LLC v. Altimate Care, LLC*, 2022-Ohio-1181, ¶ 35 (10th Dist.) ("Promissory estoppel claims may be pleaded alternatively to breach of contract claims, but the oral agreement on which the promissory estoppel claim is based cannot be used to alter the unambiguous written contract."); *Ma*, 2020-Ohio-1471, at ¶ 32 (1st Dist.) ("because a valid and binding contract governs [the plaintiff's] employment, we see no role for promissory estoppel to play here" as there was no evidence of additional promises outside of the written contractual terms), citing *Padula v. Wagner*, 2015-Ohio-2374, ¶ 43 (9th Dist.) ("Accordingly, no cause of action based in promissory estoppel will lie regarding [the plaintiff's] term of employment or claim that he was entitled to additional compensation, where valid, binding contracts govern these matters, and no additional or supplemental promises have been alleged.").

**{¶74}** Where both claims hinge on the same agreements, both claims fail where the parties' interpretation argument failed. *QDP* at ¶ 48, 50 (pointing out the agreement was contractual in nature and there was no oral promise in any event where the appellant argued, "even if an enforceable contract did not exist, [the appellant] should still be entitled to recover pursuant to its claims for promissory estoppel"). Regardless of her interpretation of the trial court's alternative holding, Appellant acknowledges her contract claim and her promissory estoppel claim both hinged on the question of whether Appellee fulfilled the cited promises. The analysis of the cited promises and their fulfillment had already been conducted under the contract claim portion of the trial court's judgment, just as we have already conducted the analysis of the cited evidence related to the promises in the prior assignment of error. On such basis, this assignment of error is without merit.

ASSIGNMENT OF ERROR THREE

**{¶75}** Appellant's third and final assignment of error alleges:

"THE TRIAL COURT ERRED IN FINDING THAT THERE IS NO EVIDENCE OF BAD FAITH WHICH COULD SUPPORT A CLAIM OF UNJUST ENRICHMENT."

**{¶76}** "Unjust enrichment is an equitable doctrine to justify a quasi-contractual remedy that operates in the absence of an express contract or a contract implied in fact to prevent a party from retaining money or benefits that in justice and equity belong to another." *Cleveland Mack Leasing, Ltd. v. Chef's Classics, Inc.*, 2006-Ohio-888, ¶ 34 (7th Dist.), quoting *Turner v. Langenbrunner*, 2004-Ohio-2814, ¶ 38 (12th Dist.). "It is an obligation which arises by law to address an instance where a party is the recipient of benefits which that party is not equitably entitled to retain." *V.T. Larney*, 2019-Ohio-496, at ¶ 26 (7th Dist.), citing *Hummel v. Hummel*, 133 Ohio St. 520, 527 (1938) (e.g., money paid by mistake, money paid on consideration which happens to fail, money obtained through extortion, or if an oral contract was unenforceable under the statute of frauds because it could not be performed within a year).

**{¶77}** As confirmed by the Ohio Supreme Court, evidence of the following elements is required for an unjust enrichment claim: the plaintiff's conferring a benefit on the defendant; the defendant's knowledge of the benefit; and the defendant's retention of the benefit under circumstances where retention without payment to plaintiff is unjust. *Bunta v. Superior VacuPress, L.L.C.*, 2022-Ohio-4363, ¶ 36; *V.T. Larney*, 2019-Ohio-496, at ¶ 26 (7th Dist.), citing *In re Estate of Udell v. Seely*, 2016-Ohio-6974, ¶ 9 (7th Dist.) ("The only remedy available to a party in raising an unjust enrichment claim is restitution of the reasonable value of the benefit unjustly conferred.").

**{¶78}** In the paragraph of the trial court's judgment entry related to this claim, it was noted the unjust enrichment claim was brought in the alternative to the breach of contract claim. The court found the unjust enrichment claim failed as a matter of law because there was a valid, enforceable contract underlying the relationship and no evidence of bad faith or other illegality. (10/2/25 J.E. ¶10), citing *MRI Software, L.L.C. v. W. Oaks Mall FL, L.L.C.*, 2018-Ohio-2190, ¶ 34 (8th Dist.) ("Unjust enrichment operates in the absence of an express contract or a contract implied in fact to prevent a party from retaining money or benefits that in justice and equity belong to another . . . Absent bad faith, fraud, or some other illegality, an equitable action for unjust enrichment cannot exist where there is a valid and enforceable written contract."). The trial court also found even if there was not a valid contract here, the unjust enrichment claim would fail because there was no evidence Appellant was denied compensation. *Id.*, citing *V.T. Larney* at ¶ 26.

**{¶79}** Appellant's brief specifically acknowledges a breach of contract claim and an unjust enrichment claim are inconsistent when an enforceable contract addresses the same subject matter or conduct as the unjust enrichment claim. (Apt. Br. 13-14), citing *TruLogic, Inc. v. Gen. Elec. Co.*, 2021-Ohio-2860, ¶ 3 (2d Dist.) ("Unjust enrichment involves a contract implied in law. Where an express agreement exists, there can be no implied agreement."). In the cited case, the Second District noted unjust enrichment may be pled as an alternative remedy even where an express contract existed, but then upheld a dismissal for failure to state a claim where the written contract covered the same matters. *Id.* at ¶ 74. More relevant, our district has stated unjust enrichment is inapplicable where the express agreement concerns the same compensation issues unless there is bad faith, fraud or illegality, but both claims may be viable where there is evidence a party was unjustly enriched by conduct separate from the contractual claim. *Bova v. B & J Pools, Inc.*, 2023-Ohio-1680, ¶ 16 (7th Dist.); *see also Cleveland Mack Leasing*, 2006-Ohio-888, at ¶ 34 (7th Dist.).

**{¶80}** Reciting the same principle as the *MRI Software* case cited in the trial court's judgment, Appellant points to an Ohio Supreme Court case finding no breach of contract and then addressing alternate claims by observing:

> The contract here describes the nature of services to be rendered and the compensation to be paid. The record does not reveal that [the defendant] received unjust enrichment outside the parameters of the express contract.
> In the absence of fraud, illegality or bad faith, [the plaintiffs] are entitled to compensation only in accordance with the terms of the written agreement.

*Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55 (1989), citing *Ullmann v. May*, 147 Ohio St. 468 (1947), paragraph three of the syllabus ("A person competent to contract who, pursuant to a written agreement with another has performed services, is entitled to compensation therefor only in accordance with the terms of such bargain, in the absence of fraud, illegality or bad faith.").

**{¶81}** Flanking this quote from the *Ullman* syllabus were two similar holdings: "Courts do not relieve a party competent to contract from an improvident agreement in the absence of fraud or bad faith . . . In the absence of fraud or bad faith, a person is not entitled to compensation on the ground of unjust enrichment if he received from the other

that which it was agreed between them the other should give in return." *Ullmann* at paragraph two and four of the syllabus.

**{¶82}** More recently, the Supreme Court addressed unjust enrichment by reiterating: "Generally, Ohio law does not permit recovery under the theory of unjust enrichment when an express contract covers the same subject matter." *Bunta*, 2022-Ohio-4363, at ¶ 36. The Court explained this limitation is imposed because the parties already fixed their relationship in an express contract, making it unnecessary for the law to imply their contractual relationship. *Id.* at ¶ 39. The Court additionally emphasized, the plaintiff "is not entitled to compensation on the ground of unjust enrichment if he received from the other that which it was agreed between them the other should give in return." *Id.* at ¶ 41, quoting *Ullmann* at 478, quoting Restatement of the Law, Restitution, § 107, Comment a (1937). The Court then concluded the trial court should have entered a directed verdict on the plaintiff's unjust enrichment claim due to the contract while noting there was no allegation of duress or unsound mind at the time the contract was entered (without specifically mentioning bad faith, fraud, or illegality). *Id.* at ¶ 41-45 (with six justices agreeing with the unjust enrichment analysis), citing *Ullmann* at 477-478.

**{¶83}** The genesis of the holding regarding an express contract on the same subject and the holding regarding bad faith, fraud, or illegality was the same; i.e., if the contract is unenforceable for the listed reasons, then there no longer remains an express contract on the same subject to enforce. In the *Ullman* case cited in both *Aultman* and *Bunta*, the Supreme Court explicitly adopted the following rule:

> A person of full capacity who, pursuant to a contract with another, has performed services or transferred property to the other or otherwise has conferred a benefit upon him, is not entitled to compensation therefor other than in accordance with the terms of such bargain, *unless the transaction is rescinded for* fraud, mistake, duress, undue influence or illegality, or unless the other has failed to perform his part of the bargain.

(Emphasis added.) *Ullmann*, 147 Ohio St. at 477-478, quoting Restatement of the Law, Restitution, § 107, at 447 (1937). The Court also adopted Comment a to this Restatement section: "A person is not entitled to compensation on the ground of unjust enrichment if he received from the other that which it was agreed between them the other should give

in return." *Id.* at 478 (and then found no evidence of fraud or bad faith, which must be established by clear and convincing evidence).

**{¶84}** Appellant's complaint said Appellee was unjustly enriched by keeping the money she was owed under the payment clause of the contract. In opposing summary judgment, Appellant argued for contract enforcement and *did not argue for contract rescission*. Regardless of Appellant's overbroad reading of the unjust enrichment law as containing an exception if any instance of bad faith at any point is alleged, her argument fails in any event.

**{¶85}** In response to Appellee setting forth the law on unjust enrichment (absent fraud, bad faith, or illegality, a party to a contract cannot recover for unjust enrichment on the same subject as the contract), Appellant said she was permitted to proceed on unjust enrichment even though there was a contract on the same subject of her compensation because she showed *bad faith*. On this topic, she asserted the fact that Appellee was defending against her lawsuit by claiming compliance with the contract should be considered bad faith because she alleged R.G. Jr. once said he could not "honor" an inquiry she made about the 10% figure in the context of her desire to make more money. She reiterates this argument here. However, defending a lawsuit is not bad faith nor is rejecting an employee's interpretation of a clause allegedly voiced to an owner of a corporation months after the agreement was executed.[3] We also refer back to our discussion of the vague nature of Appellant's evidence setting forth her alleged inquiry to R.G. Jr.

**{¶86}** Appellant contends, "only after it is ultimately determined the contract is enforceable and that there has been a compensable breach, can it be said that the contract and unjust enrichment claims are inconsistent." Again, the enforceability of the contract was not in dispute during the summary judgment proceedings, and Appellant conflates enforceability with breach. Regarding claims brought in the alternative to a

---

[3] The Ohio Supreme Court has observed *a party does not fail to act in good faith by seeking to enforce the contract (or by acting as permitted by its express terms)*. *Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15, ¶ 43-44 (in holding there is no separate cause of action for breach of an implied duty of good faith in a breach of contract case and no violation of the implied duty unless there is a breach of a specific contractual obligation, such as a clause on discretionary decisions). The Court also ruled "a party cannot predicate fraud on predictions or projections relating to future performance" and "to be actionable, a misrepresentation must involve a matter of fact that relates to the past or present." *Id*. at ¶ 63.

breach of contract claim, the same subject matter was addressed by the enforceable contract and it was determined there was no evidence a reasonable person could find a breach. As set forth above, the claims hinged on the same threshold argument. If the argument failed, then summary judgment on all claims was proper as there was no unjust enrichment where compensation followed the agreement and there was no inequitable retention of a benefit conferred by Appellant as a valid contract was the legal justification for the cited enrichment. This assignment of error is without merit.

**{¶87}** For the foregoing reasons, the trial court's judgment is affirmed.

Hanni, J., concurs.

Dickey, J. concurs.

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**